54 F.3d 1437
 Clyde MURDOCK; Linda Murdock; Jeffrey Murdock, Plaintiffs-Appellants,
v.
Ed STOUT; City of Fontana; Jacobson, Police Officer # 193;
Walby, Police Officer # 222; and Robins, Police
Officer # 307, Defendants-Appellees.
 Nos. 93-56248, 93-56643.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1995.
Decided April 26, 1995.
 
 Stephen Yagman, Yagman & Yagman, Venice, CA, for plaintiffs-appellants.
 David D. Lawrence and Carol D. Janssen, Franscell, Strickland, Roberts & Lawrence, Pasadena, CA, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: BEEZER and NOONAN, Circuit Judges, and EZRA, District Judge.*
 Opinion by Judge BEEZER; dissent by Judge NOONAN.
 BEEZER, Circuit Judge:
 
 
 1
 We consider whether exigent circumstances justified the warrantless entry and search of a house along with the brief seizure of an occupant by police officers investigating a suspected burglary.
 
 
 2
 Clyde Murdock, Linda Murdock, and Jeffrey Murdock (collectively "Murdock") appeal the district court's grant of summary judgment in favor of Ed Stout, the City of Fontana, California, and Fontana Police Officers Mark Jacobson, Dave Walby and Darren Robins (collectively "Fontana") in Murdock's 42 U.S.C. Sec. 1983 action alleging a violation of his rights under the Fourth Amendment. The district court concluded that the police officers acted reasonably when they entered Murdock's house without a warrant and briefly detained him while investigating a possible burglary. We have jurisdiction, 28 U.S.C. Sec. 1291, and we affirm.
 
 
 3
 * The facts are undisputed. On March 23, 1992, Robert Keck called the Fontana Police Department to report what he believed was suspicious activity in his neighborhood. Keck informed the Fontana police dispatcher that a passerby had told him that he saw a young person run from a neighbor's house across the street, enter an automobile and drive away. The house, identified by Keck as 13767 Lighthouse Court, was, according to the passerby, dark. The dispatcher, believing that a "possible burglary or other crime had occurred" contacted three police officers by radio.[1]
 
 
 4
 Fontana Police Officers Jacobson, Walby, and Robins arrived at the house to investigate shortly before 8:30 p.m. The officers observed that the windows were secure and the garage door was closed. Officers Jacobson and Robins proceeded to the rear of the house, where they noticed a sliding door open approximately 8 to 10 inches. Inside, a television was on "at a low setting" and the lights were "dim." Officer Jacobson twice announced his presence by shouting, "Fontana Police. Anybody home?" The announcement was sufficiently loud for Officer Walby to hear it across the street. No one responded. The telephone then rang several times. No one answered, and an answering machine was activated.
 
 
 5
 At this point, Officers Jacobson and Robins entered the house through the open door. Using their flashlights, and with their guns drawn, they searched the living room and kitchen. The officers discovered several cans of beer on a table near the television. The officers then entered the bedroom. They observed a man, later identified as Clyde Murdock, lying on the bed partially covered by some type of blanket. Officer Jacobson announced that he was a police officer. Because the man's hands were hidden under the blanket, Officer Jacobson immediately demanded that the man show his hands. Murdock began yelling at the officers. Officer Jacobson eventually removed the blanket, discovering that Murdock was fully clothed and was wearing shoes.
 
 
 6
 Officer Robins then let Officer Walby in the house. As Murdock had yet to be identified, Walby and Robins continued to search the house for "possible suspects or other persons." They found nothing. While this additional search was being performed, Murdock refused to answer Officer Jacobson's questions regarding his name and address.
 
 
 7
 When Walby and Robins returned to the bedroom, the officers conducted a pat down search of Murdock.[2] Murdock was then identified by his driver's license. He continued to act belligerently toward the officers and demanded their badge numbers. The officers provided Murdock with their badge numbers and left the Murdock residence, stopping at Keck's house to inform him that no burglary or other crime had occurred.
 
 
 8
 Murdock later called Fontana Police Headquarters to complain about the incident. A police sergeant explained the reason for the intrusion. Murdock did not request an investigation.
 
 
 9
 Murdock filed a section 1983 action seeking money damages of 20 million dollars. Both parties moved for summary judgment. The district court granted Fontana's motion, concluding that the officers acted reasonably when they conducted a warrantless search of the house and briefly seized Murdock. Murdock appeals.
 
 
 10
 Murdock later sought sanctions pursuant to Federal Rule of Civil Procedure 11 against Fontana because it initially included a claim for photocopying expenses in its bill of costs. Fontana withdrew its request after Murdock objected to the claim. The district court declined to impose sanctions. Murdock also appeals this decision.
 
 II
 
 11
 We review de novo a district court's determination of the validity of a warrantless entry into a residence. United States v. Lai, 944 F.2d 1434, 1441 (9th Cir.1991), cert. denied, 502 U.S. 1062, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992). We also review de novo a grant of summary judgment. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 12
 The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A warrantless search or seizure carried out in a private residence is presumptively unreasonable. Welsh v. Wisconsin, 466 U.S. 740, 748-49, 104 S.Ct. 2091, 2096-97, 80 L.Ed.2d 732 (1984); Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2042-43, 29 L.Ed.2d 564 (1971). Indeed, the protection of individuals from unreasonable government intrusion into their houses remains at the very core of the Fourth Amendment. Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639 (1980); see also United States v. United States Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) (physical entry of the home is "chief evil against which the wording of the Fourth Amendment is directed").
 
 
 13
 Police entry into a house without a warrant is not, however, always unreasonable. Instead, a number of purportedly "well-delineated" exceptions permit law enforcement officers to conduct constitutionally reasonable searches and seizures without a warrant. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Because a warrantless search is presumed to be unreasonable, Fontana bears the burden of establishing the applicability of any exception.
 
 
 14
 Here, Fontana invokes the "exigent circumstances exception" to the search warrant requirement. The exigency exception, unlike other more discrete counterparts such as consent searches or searches incident to arrest, is in fact more of a residual group of factual situations that do not fit into other established exceptions. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment Secs. 6.5-6.6 (2d ed. 1987). The critical commonality shared by exigency cases is the need for quick action in an emergency situation. United States v. Warner, 843 F.2d 401, 403 (9th Cir.1988) (noting that presence of exigent circumstances necessarily implies insufficient time to obtain a warrant).
 
 We have defined exigent circumstances as:
 
 15
 "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."
 
 
 16
 Lai, 944 F.2d at 1442 (quoting United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). We evaluate the reasonableness of a warrantless entry in view of the totality of the circumstances from the perspective of the police officers at the time of the entry. United States v. Lindsey, 877 F.2d 777, 781 (9th Cir.1989).
 
 
 17
 Although exigent circumstances relieve the police officer of the obligation of obtaining a warrant, they do not relieve an officer of the need to have probable cause to enter the house. Lai, 944 F.2d at 1441; United States v. Valles-Valencia, 811 F.2d 1232, 1236 (9th Cir.), amended, 823 F.2d 381 (1987). One commentator has noted, however, that an analysis of probable cause in exigency cases "must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences." LaFave Sec. 6.6(a), at 698.[3]
 
 
 18
 To determine if the officers had probable cause to enter Murdock's house, we examine the totality of the circumstances known to the officers at the time they entered. Lai, 944 F.2d at 1441 (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Probable cause requires only a fair probability or substantial chance of criminal activity, not an actual showing that such activity occurred. Gates, 462 U.S. at 244, 103 S.Ct. at 2335.
 
 
 19
 When the three Fontana police officers arrived at the house, they knew that there had been a report of suspicious activity indicating a possible burglary or other crime had been or was being committed. Upon moving to the rear of the house, the officers discovered an open door. Based on these facts, we doubt that there would be sufficient probable cause to support entry. We have upheld, as have other courts, exigent circumstance searches based on officers finding physical evidence of a burglary, such as a broken window or forced lock. See Valles-Valencia, 811 F.2d at 1236 (officers observed signs that front window was pried open); United States v. Johnson, 9 F.3d 506, 509-10 (6th Cir.1993) (officers discovered broken window and people inside house who had no identification or keys), cert. denied, --- U.S. ----, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994); United States v. Dart, 747 F.2d 263, 267 (4th Cir.1984) (officers observed locks sawed off and door forced open); United States v. Estese, 479 F.2d 1273, 1274 (6th Cir.1973) (officers observed signs that apartment door had been pried open). In our judgment, the open door at Murdock's house was itself not sufficient to satisfy the standards in these cases where physical signs of burglary were evident.
 
 
 20
 The police officers did not, however, enter the house based only on the open door and the neighbor's report. They observed several indications that a resident was or should have been at the residence. The lights were on and a television was on, in addition to the door being open. The officers prudently attempted to make contact with the resident, no doubt to make sure the resident was safe in light of the officers' concern that a burglary or other crime might have occurred. Officer Jacobson shouted twice, but received no answer, nor did any resident answer the telephone. These additional pieces of information, indicating that a resident should have been home, but was not responding, combined with the earlier report of suspicious activity and the presence of the open door tip the scales to supply the officers with probable cause to believe that some criminal activity had occurred or was occurring or that a resident in the house might have been in danger or injured.[4]
 
 
 21
 Given the presence of probable cause, we have little difficulty in concluding that exigent circumstances justified the immediate warrantless entry. The police officers had a reasonable belief that they had insufficient time to obtain a warrant. Lai, 944 F.2d at 1442. We agree with the Seventh Circuit that when police are responding to a possible crime, police judgments should be afforded an "extra degree of deference." Reardon v. Wroan, 811 F.2d 1025, 1029 (7th Cir.1987); see also Johnson, 9 F.3d at 510.
 
 
 22
 Furthermore, only a mild exigency need be shown where entry can be accomplished, as here, without physical destruction of property. Lai, 944 F.2d at 1442; McConney, 728 F.2d at 1206. The facts known to the police officers indicated that a resident was not responding when the circumstances inside the house strongly suggested that a resident should have been present. This gave the officers reason to enter immediately without a warrant. Indeed, we are convinced that citizens in the community would have understandably viewed the officers' actions as poor police work if they had left the scene or failed to investigate further at once.
 
 
 23
 Once the officers were inside the house they conducted a brief search of the house in order to locate any occupant. After they found Murdock, fully-clothed, wearing shoes, lying on a bed with his hands covered by a blanket, they tried to ascertain his identity. Murdock was uncooperative. The officers acted reasonably in briefly seizing Murdock and conducting a pat down search to look for weapons. See Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1879-81, 20 L.Ed.2d 889 (1968); cf. Maryland v. Buie, 494 U.S. 325, 333, 110 S.Ct. 1093, 1097, 108 L.Ed.2d 276 (1990) (extending Terry principles, under certain circumstances, to police-citizen confrontations in houses; in Buie, the context was a protective sweep while carrying out an arrest warrant); Michigan v. Summers, 452 U.S. 692, 702 n. 17, 705, 101 S.Ct. 2587, 2594 n. 17, 2595, 69 L.Ed.2d 340 (1981) (permitting brief seizure of occupant of premises while conducting search pursuant to a warrant, while leaving open possibility that exigent circumstances could justify comparable police conduct absent a warrant). After Murdock was identified, the officers immediately left the premises. The officers' conduct never exceeded the scope of the exigency. See Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (warrantless search must be strictly circumscribed by the exigency that justified the initial entry).
 
 
 24
 We must also observe that there was no indication here that the officers were using their burglary investigation as a pretext for conducting a search for evidence in Murdock's house. We would be more reluctant to accept officers' claims of exigency if we found persuasive pretext evidence. See LaFave Sec. 6.6(b), at 708 ("courts must be especially vigilant in guarding against subterfuge, that is, a false reliance upon the property protection rationale when the real purpose was to seek out evidence of a crime."). Absent any evidence of pretext, we are more inclined to give deference to the judgments of police officers doing their job in the field.
 
 
 25
 Under different circumstances, the details judged to be suspicious by the officers would be innocuous, such as an open door, a dimly lit house, a television turned on, and an unanswered telephone. We, however, must examine the circumstances as they appeared to the police officers in light of their situation at the time. On the evening of March 23, 1992, these circumstances gave the officers probable cause to believe that a crime might be ongoing or might have taken place and that someone might be in need of their help. We do not believe that the Fourth Amendment's crucial protections of the sanctity of a person's house are jeopardized by the police officers' entering a house without a warrant under the limited and compelling circumstances of this case.
 
 
 26
 At oral argument, Murdock contended that our decision in United States v. Erickson, 991 F.2d 529 (9th Cir.1993), controls the outcome of this case in his favor. For several reasons, we disagree.
 
 
 27
 In Erickson, a police officer dispatched to investigate a suspected burglary arrived at a house in the afternoon and spoke to neighbors who had seen two men dragging a bag across the backyard. The officer walked into the backyard. He observed that no one appeared to be home, but did not knock on the door or make any other effort to contact a resident. The officer noticed an open basement window with a "black plastic sheet" covering the opening. The officer pulled back the sheet and spotted marijuana plants. The district court suppressed the evidence at a subsequent trial.
 
 
 28
 On appeal, the government did not argue that the search was justified by exigent circumstances. Instead, it argued that a police officer investigating a suspected burglary was performing a "community caretaking function" and was not subject to the probable cause requirement of the Fourth Amendment. The government argued, rather, that the officer need only act "reasonably under the circumstances." Id. at 531. We rejected that argument, holding that the need for police officers to enter houses without a warrant while investigating suspected burglaries was adequately protected by "the exigent circumstances exception to the warrant requirement." Id. at 533.
 
 
 29
 We specifically stated that "[t]he government does not challenge on appeal the district court's finding that exigent circumstances did not exist in this case. We therefore do not pass upon that ruling." Id. Thus, while we indicated that police officers must have probable cause and exigent circumstances to conduct a warrantless search, we did not state whether the facts in that case would have satisfied either of those requirements.
 
 
 30
 In any case, the facts in Erickson are distinguishable. In that case, arriving in mid-afternoon, the police officer observed only an open window. The officer made no effort to contact a resident. He did not knock on the door. He did not observe any signs that a resident should have been inside. Here, the Fontana officers, while investigating a suspected burglary in the evening, noticed an open door and evidence that a resident should have been at home. The officers made the further step of trying to make contact with a resident. Only after their efforts failed did they enter the house. Clearly, the equation for the police officer in Erickson was much different than for the officers here. The police officers here had a fair probability that something was amiss inside the house and that a resident might be in need of assistance. The burglary report, the open door, and the disturbing lack of response from a resident when the situation in the house indicated the presence of a resident were far different than the facts known to the officer in Erickson.
 
 
 31
 In conclusion, the three Fontana police officers had probable cause and exigent circumstances sufficient to justify their warrantless entry into Murdock's house to investigate what might have been the scene of a burglary or other crime. The officers acted reasonably inside the house by looking for a possible victim or perpetrator, and securing the unknown fully-dressed occupant until his identity could be established. The fact that the officers' suspicions were wrong does not alter our view that the circumstances known to them outside the house justified all of their actions.[5]
 
 III
 
 32
 Murdock also argues that the district court erred in issuing a standing jury instruction order. The standing order required that the parties meet and confer at least 14 days before trial to address proposed jury instructions. We decline to address this issue as it is not yet ripe for review, and alternatively because Murdock has no standing to raise it. See St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir.), cert. denied, 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989) (court should not review a claim that lacks ripeness); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-63, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992) (plaintiff must demonstrate actual injury). Because the district court granted summary judgment in favor of Fontana, a trial was never held and Murdock was never required to comply with the standing order. Cf. Fikes v. Cleghorn, 47 F.3d 1011, 1015 (9th Cir.1995) (declining, on mootness grounds, to address whether standing order violated Fed.R.Civ.P. 83 because order was never enforced).
 
 IV
 
 33
 Murdock argues that the district court erred in denying his motion to impose sanctions on Fontana's counsel. He contends that Fontana submitted a bill of costs that included photocopying costs in the amount of $803.50, which Murdock argues are not recoverable. Murdock alleges that because Fontana knew the costs were not recoverable, it violated Federal Rule of Civil Procedure 11 by signing the bill of costs. We disagree.
 
 
 34
 Federal Rule of Civil Procedure 11 provides for sanctions if a party signs a pleading, motion, or other document that contains claims not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law...." A district court's decision to deny sanctions under Rule 11 is reviewed for abuse of discretion. Larez v. Holcomb, 16 F.3d 1513, 1521 (9th Cir.1994).
 
 
 35
 Murdock cites no authority demonstrating that the requested photocopying costs are not recoverable. Absent this showing, there is no evidence that Fontana's request was improper. Indeed, 28 U.S.C. Secs. 1920(3) and (4) indicate that expenses for some printing and photocopying are recoverable costs. See Dohmen-Ramirez v. Commodity Futures Trading Comm'n, 846 F.2d 1200, 1202 n. 1 (9th Cir.1988). In any case, when Murdock filed an objection to the photocopying costs, Fontana chose not to contest them based on its determination that the time needed to obtain documentary support for these costs exceeded the potential recovery. This decision is not unreasonable and certainly not sanctionable. We conclude that the district court did not abuse its discretion in denying sanctions.
 
 
 36
 AFFIRMED.
 
 NOONAN, Circuit Judge, dissenting:
 
 37
 In United States v. Erickson, 991 F.2d 529 (9th Cir.1993), police officers were informed of a suspected burglary, arrived at the scene and spoke to two neighbors who told them they had seen two men dragging a large brown plastic bag, apparently full of heavy items, across the backyard of the residence adjacent to the scene of the suspected burglary. One of the officers found an open basement window at the scene of the suspected crime and pulled back a plastic sheet to investigate the basement. On doing so, the officer saw numerous marijuana plants and smelled marijuana. This court upheld the order of the district court suppressing the evidence that was obtained by the policeman's look. In the hearing before the district court the government had maintained that the police had acted in exigent circumstances. When District Court Judge Robert Bryan found there were no such circumstances, the government abandoned this ground on appeal and sought to justify the search in terms of the community caretaking functions of the police--a justification that we treated as equally unavailing. In other words, even where two neighbors, interviewed by the police, had seen strong indication that a burglary had taken place, not even the prosecutors were willing to argue on appeal that the police were acting in exigent circumstances when they peeked into the house. The attempt by the majority to distinguish Erickson from this case rings hollow.
 
 
 38
 At a time when the use of the exclusionary rule is being relaxed judicially and when further relaxations are contemplated by Congress, it is particularly necessary to maintain the vitality of the Fourth Amendment in assuring the sanctity of the homes of law-abiding citizens. It would be not much less than a constitutional catastrophe if this court were willing to relax its vigilance. Here is what happened in this case. Clyde Murdock was confronted in his bedroom, as he lay asleep in his bed, by an armed police officer, who with his gun drawn, told him to show his hands. This unexpected request woke Murdock up. From his prone position, he saw a gunman holding a gun at his head. He asked the gunman: "Who are you? What are you doing in my house? Why are you here?" He received no answer to these questions (the majority opinion stigmatizes him as "uncooperative"). Instead, the gunman continued to shout at him to show his hands and finally yanked the blanket from his bed. Murdock was then kept covered by the gun while two other police officers searched his house. After the search of the house had been completed, the police then conducted a pat-down search. Murdock asked the gun-holding officer "to get the gun out of his face." There was no response. When the pat-down was completed, the police looked at his driver's license and identified him as the owner of the house. The majority opinion is pleased to describe this astounding series of events as a Terry stop. It is, however, difficult to know or even imagine what the basis for a Terry stop of a man asleep in his own bed might be. I trust that it is not that he had gone to sleep in his clothes that made him the object of the police belief that they confronted a criminal. The Terry rule was designed to cover "street encounters" between citizens and the police on the beat. See Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). It was originally applied on behalf of a police officer with "reason to believe that he was dealing with an armed and dangerous individual." Id. at 27, 88 S.Ct. at 1883. It does not protect police action taken in good faith based on "inarticulate hunches." Id. at 22, 88 S.Ct. at 1880. Nor does it protect decisions that are a "product of a volatile or inventive imagination." Id. at 28, 88 S.Ct. at 1883.
 
 
 39
 The majority opinion relies on Maryland v. Buie, 494 U.S. 325, 333, 110 S.Ct. 1093, 1097, 108 L.Ed.2d 276 (1990) and Michigan v. Summers, 452 U.S. 692, 702, n. 17, 705, 101 S.Ct. 2587, 2594, n. 17, 2595, 69 L.Ed.2d 340 (1981), for the majority's extension of Terry. Examination of those cases shows them far from the case at hand. Buie involved a "protective sweep" of a dwelling in connection with the arrest within it of an individual for whom the officers had a warrant. Terry was invoked by way of analogy only, to show that application of the Fourth Amendment requires balancing to determine reasonableness. Buie, 494 U.S. at 332-33, 110 S.Ct. at 1097-98. There was no suggestion that Terry was itself extended to stops effected within a home. Buie itself contains the warning that for a protective sweep within a home "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334, 110 S.Ct. at 1098. What articulable facts of this character justified the police sweep here after finding the television on, Buds near the screen, and a man asleep in bed?Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) involved the execution of a warrant, in this case a search warrant of a house. Incident to its execution, the police stopped a man on the front steps leaving the house and detained him during the search; the stop was held lawful. In Summers, the Court notes that it is not deciding what might be justified by exigent circumstances, absent a warrant. Id. at 702, n. 17, 101 S.Ct. at 2594, n. 17. Instead, the Court declared: "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705, 101 S.Ct. at 2595. The Court's careful delineation of the limits on police action with a warrant stands in startling contrast to what the majority opinion in this case approves in a warrantless police action without probable cause. Terry is here extended to an almost unimaginable degree. Sound asleep in your own bed you can be nabbed by police whose chief ground for the "stop" is that a blanket covers your hands and clothes.
 
 
 40
 It may be that, deep in the memory of the three policemen who carried out this operation, there was the story of Goldilocks and the Three Bears. Like the Three Bears, the three policemen at first encountered a scene where one or more persons had been enjoying themselves--in this case by drinking Budweiser. They then opened a closed bedroom door and found a person they did not know asleep, clothed, in a bed. If they were the Three Bears, they could have identified this sleeping figure as an alien in their home and could have at least effected a Goldilocks stop if not a Terry stop. However, the analogy falters. The three bears were in their own home and so could recognize a stranger in it when they saw one. The three policemen were in Clyde Murdock's home and had no reason to suppose that the sleeping man who had drunk some beer was now committing or had just committed a crime.
 
 
 41
 In some way that is not fully articulated the majority opinion attempts to link this use of armed force in a man's bedroom to the events that occurred in the mind of the police shortly before their entry. A little after 8:00 p.m. that spring evening a neighbor of Murdock's had encountered an unidentified person who is described simply as "a passing person." The passing person told the neighbor that a boy, 16 to 22 years of age, had run from a house at the end of the cul de sac and had driven off in a black Chevy. On the basis of this tip the neighbor called the Fontana Police Department. The defendants' statement of facts continues: "Because the house was dark, it was believed that a possible burglary or other crime had occurred." The majority opinion shows some embarrassment as there is no identification of who believed that a possible burglary or other crime had occurred. Was it the passing person, the neighbor or the police dispatcher? What was the basis for this belief? The Murdocks had children; it was scarcely surprising that a Murdock child or a friend should run out of the house and enter a car. There was no report of anyone carrying loot from the Murdock house. There was no sign of forced entry. Compared with the facts in Erickson, these facts do not even amount to a suspicion that a burglary had occurred. Unlike Erickson, where the informants who had seen the two men moving the heavy bag were interviewed by the investigating police, in this case the police had no idea who the passing person was who made the comment that triggered their response. The police did not interview the neighbor who had called the police. A farfetched guess might have been that a boy had entered the house and had run out again, although even that speculation would have had almost no basis. The basis for believing that a burglary was actually in progress was nil.
 
 
 42
 Despite this shadowy bit of information, the police dispatcher sent three cruisers to the Murdock house. The police did a bang-up job of covering the house front and back with their guns drawn. They examined the house and garage and found everything locked, except a sliding door at the rear which was eight to ten inches open--an open door on a spring evening in southern California is scarcely surprising, let alone suspicious. At this point the majority opinion concedes that the police had no basis for entering Murdock's home, no basis for believing that there were exigent circumstances.
 
 
 43
 The police could hear a television set on and see some lights. That no doubt warranted the belief that somebody was at home. When they called "police" and no one answered and when a telephone answering device answered a random telephone call, the police jumped to the conclusion that there was someone at home who was being prevented from answering them, and made the further assumption that this person was being criminally restrained rather than being in the shower, the toilet, or his or her bed. Thereupon they made their bold entry that led them to see and seize Clyde Murdock in his bed. Their imaginations had been active, volatile and inventive.
 
 
 44
 The defense claim of exigent circumstances here comes down to the claim that when a homeowner is asleep and does not answer his phone or a police call, the police have reason to think that a crime is probably in progress. On the basis of that doctrine, there must be a good many homes in California that may be entered by roving policemen.
 
 
 45
 The majority opinion tries to suggest that the earlier anonymous and entirely mistaken report of a "possible burglary or other crime" that "had occurred" can somehow be put together with the homeowner's silence to create exigent circumstances. Zeroes do not add up. No scrap of information pointed to a burglary in the present. At the very most the police had suspicion that a possible crime had taken place. There was absolutely no reason to believe a crime was occurring at the time the police arrived. The defendants do not assert any basis for such a supposition. There was no reason to think that when the television was on and an answering machine was in operation that mere non-response to a police call indicated a criminal emergency occurring within the house.
 
 
 46
 The majority opinion recites words that courts up until now have taken seriously. An entry into a person's home without a warrant is "presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). To have police officers thrust themselves into a home is "a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). As we have put it: "The warrantless search of a private residence strikes at the heart of the Fourth Amendment protections." Erickson, 991 F.2d at 532.
 
 
 47
 Instead of applying Fourth Amendment law as set out on behalf of a person accused of a crime in Erickson, the majority opinion flouts Erickson to deny protection to a law-abiding homeowner. Instead of preserving the limits on arrest with a warrant and search with a warrant, so carefully set out in Buie and Summers, the majority opinion approves an expansive doctrine of police freedom to act on hunch without warrant or even articulable facts. In a case which is of first impression in this circuit, Terry stop authority is given an enormous extension. Instead of being treated as presumptively unreasonable, the break-in by the police and the seizure of Clyde Murdock are rationalized by speculation. Instead of their actions being treated as a grave concern not only to Clyde Murdock but to all of us, the police officers that committed the outrage are shielded from liability. Instead of protecting the heart of the Fourth Amendment, the majority opinion strikes at it.
 
 
 48
 I would reverse the district court.
 
 
 
 *
 The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 The "Defendant's Contentions Regarding Facts," which Murdock accepts as undisputed, include an unfortunate use of the passive voice at a critical place. After detailing the information that Keck told the dispatcher, the statement of facts continues, "[b]ecause the house was dark, it was believed that a possible burglary or other crime had occurred." (emphasis added). We would have been delighted had the statement of facts indicated who believed that a burglary had occurred. Nevertheless, in our judgment, the only fair reading of this inartful sentence is that both Keck and the dispatcher believed that a burglary or other crime had occurred. This reading provides the only explanation of why the dispatcher called three police officers to investigate. This interpretation is also supported by transcripts of the conversations between Keck and the dispatcher and between the dispatcher and the police officers
 
 
 [2]
 Although Murdock states in his brief that "impermissible force" was used against him by the Fontana police officers and that the Fontana Police Department has a policy or practice of taking similar action, he does not cite to any evidence in the record supporting these allegations, nor does he offer any cases or argument in support of the claims. We decline to consider them
 
 
 [3]
 Some courts have recognized an exception, distinct from exigent circumstances, where there is an emergency involving imminent danger to life or property such as where an officer observes a fire in a house or hears a scream from a house. These scenarios invoke the so-called "emergency doctrine." LaFave Sec. 6.6(a), at 699; see New York v. Mitchell, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, cert. denied, 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191 (1976). In Mitchell, the New York Court of Appeals created a three part test to analyze emergency cases: (1) the police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. 39 N.Y.2d at 177-78, 383 N.Y.S.2d 246, 347 N.E.2d 607; see Michigan v. Davis, 442 Mich. 1, 497 N.W.2d 910, 918 (noting that police need not have probable cause but rather a "reasonable belief" that a person is in need of immediate aid in order to enter a dwelling in an emergency), cert. denied, --- U.S. ----, 113 S.Ct. 2432, 124 L.Ed.2d 652 (1993); Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (officer can make warrantless entry when he or she "reasonably believe[s] that a person within is in need of immediate aid"). We have yet to consider whether this approach, or something comparable, should be adopted in a case such as this one where police officers are investigating a possible crime at the same time they might be rendering aid to a person in danger. Because we believe that probable cause and exigent circumstances were present here to justify an exigent circumstances search, we need not address whether this case, or a similar one, could qualify under an "emergency doctrine."
 
 
 [4]
 The cases cited by Murdock, United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir.1990) and Hutchinson v. Grant, 796 F.2d 288, 290 (9th Cir.1986), are inapposite. They involve probable cause to arrest a suspect, which is not at issue here. The Fontana police officers did not seek to make any arrests
 
 
 [5]
 Because we believe the officers' conduct was reasonable, and thus affirm summary judgment, we need not address whether the officers had qualified immunity