**UNITED STATES of America, Plaintiff,**

**v.**

**Francisco MEZA–CORRALES, et al., Defendants.**

**No. CR 97–287 TUC JMR.**

United States District Court,
D. Arizona.

Dec. 24, 1997.

Michael A. Johns, United States Attorney, District of Arizona, Anne E. Mosher, Assistant U.S. Attorney, Tucson, AZ, for Plaintiff.

Stephen Ralls (CJA–S–A), Rick Jones, Myrna Rodriguez, Robert Hooker, Tucson, AZ, for Defendants.

## ORDER

ROLL, District Judge.

The court has under advisement motions to suppress evidence filed by defendants Francisco Meza–Corrales and Mark Bridges. Issues presented include: 1) the lawfulness of the initial detention of both defendants; 2) the legality of a protective sweep of the residence conducted before consent to search was obtained; and 3) the voluntariness of the consent given by Francisco Meza–Corrales for the search of his residence. Defendant Bridges lacks standing as to the second and third issues. For the reasons set forth below, both defendants' motions to suppress are denied.

## Facts

On March 26, 1997, federal law enforcement agents on surveillance observed a car arrive at 622 South Magnolia, a Tucson residence owned by defendant Francisco Meza–Corrales and his girlfriend, Charmagne Meza. Agents saw a person leave the residence carrying a bag, get into the vehicle, and drive away. Agents followed the vehicle to a nearby supermarket. When the car left that shopping area, agents decided to have the vehicle stopped. Approximately $29,000 in cash was found in a bag in the vehicle. In the interim, other vehicles came and left the residence at South Magnolia. Attempts to follow two of these vehicles failed when the vehicles were lost in traffic. It was then that the agents decided to conduct a "knock and talk" at the Magnolia residence. This procedure involves one or more agents approaching a building, knocking on the entrance door, and requesting permission to search.

After the agents met with local police in a nearby staging area to discuss the "knock and talk," they proceeded slowly down Magnolia toward the target residence in a procession of four cars, at least one of which was a marked Tucson Police Department vehicle. As agents arrived at 622 Magnolia, an individual later identified as defendant Mark Bridges was positioned at the driver's side of a Chevy Blazer which was parked in front of the residence. Bridges repeatedly sounded the horn on the utility vehicle. Agents quickly approached him, handcuffed him, and eventually had him lie on the ground. During this time, an agent reached into the vehicle to turn down the radio, which was blaring, and observed a handgun on the floor. Shortly thereafter, a second handgun was found under the driver's seat of the vehicle.

At least three agents then went to the front door of the residence. Although the front door was open, a semitransparent screen door was closed. Inside, agents could

see the silhouette of a figure. An agent yelled at the person to come to the door. This person stood sideways and, in the judgment of at least one of the agents outside the door, appeared to be watching someone else inside the house. Eventually, the person visible to agents came to the front door and one of the agents reached inside the doorway, grabbed her wrist, and pulled her outside. This individual was Charmagne Meza, the girlfriend of Meza–Corrales. While speaking with her, the agents at the door were notified that there were "runners," *i.e.* people who had fled from the house. One agent went to the backyard and observed defendant Francisco Meza–Corrales run to the fence and then turn back toward the house. This agent made eye contact with Meza–Corrales at that time. Shortly thereafter and some distance from the residence, another agent observed Mark Simmons running away. Simmons stopped when he was ordered to do so. When questioned, he stated that he had been at 622 South Magnolia. Law enforcement officers brought him back to the Magnolia residence.

While Simmons was being pursued, the same agent who had shouted for Charmagne to exit the house ascertained from her that someone named "Frank" was still in the house. He shouted for Frank to come out and, soon thereafter, Francisco Meza–Corrales emerged from the house. At that time, agents conducted a brief sweep of the residence to determine whether anyone else was still in the house. No one was found and no claim is made that any evidence was observed during this sweep.

Charmagne granted, then withdrew, permission for the agents to search the house. Meza–Corrales refused permission. Agents then considered obtaining a search warrant and a deputy sheriff assigned to the task force investigating this matter began the process of obtaining legal descriptions of the property and vehicles parked at the residence. He also contacted an Assistant United States Attorney in preparation for seeking a search warrant. During this time period, Charmagne was visibly upset and wept at times. She and Meza–Corrales sat on a short rose garden wall, with Meza–Corrales

in handcuffs. Bridges remained in handcuffs during this time, as did Simmons.

When agents spoke with Meza–Corrales, he said that Charmagne owned the house. Agents then again asked Charmagne for permission to search the residence. She refused consent, stating that she would only agree to the search if Meza–Corrales agreed. Agents then returned to Meza–Corrales, who again refused consent. Agents told Charmagne and Meza–Corrales that if they did not consent, the agents would obtain a search warrant. Charmagne was very upset and Meza–Corrales ultimately decided to consent. Agents had Meza–Corrales and Charmagne sign a consent to search form.

An agent asked Meza–Corrales if he wanted to show the agents where the drugs were located so that the agents would not damage the residence looking in all areas where drugs could be concealed. Meza–Corrales led agents to the kitchen and directed them to approximately 500 grams of cocaine. During the search, agents also found a large sum of money on the bed in the master bedroom and, in the kitchen, they found a substance often used as a cutting or dilution agent for cocaine, a razor blade next to the substance, and wrappings used to package cocaine.

### Hearing on Motion to Suppress

During the three day evidentiary hearing on the motions to suppress, virtually all law enforcement officers who had contact with the Magnolia residence on March 26, 1997 testified, as did Charmagne and Meza–Corrales.

Certain matters became apparent during the hearing. First, it is clear that the events unfolded quickly at the Magnolia residence. Second, the agents involved neglected to document many of the events which occurred.

### Lawfulness of Detention

Both Meza–Corrales and Bridges argue that they were detained in the absence of probable cause to arrest when agents detained and handcuffed them prior to discovering the cocaine in the residence.

Law enforcement agents are permitted to conduct a stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), if the agents have "a reasonable suspicion

supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30). There must exist " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

█ As to defendant Bridges, when he was initially detained, drug agents had reasonable grounds to believe that (1) a person had received $29,000 at the residence a short time earlier, (2) thereafter, other vehicles arrived at and left the residence, and (3) upon arrival of agents at the residence, Bridges was a look-out who began sounding the horn of a vehicle for the purpose of warning occupants of the residence. When Meza–Corrales was detained a short time later, all of the previous circumstances were known, and agents also knew that (1) the vehicle near which the presumed lookout was positioned contained two readily-accessible handguns, (2) two occupants of the residence had hesitated before exiting the residence, and (3) at least one person had fled from the residence when agents in raid attire had knocked on the front door. On the facts presented here, agents clearly had a founded suspicion to detain Bridges and Meza–Corrales.

Both defendants further argue that the use of handcuffs converted the detention from a *Terry* detention to an arrest. A seizure may "exceed[] the bounds of a *Terry* stop and become[] a de facto arrest...." *United States v. Torres-Sanchez,* 83 F.3d 1123, 1127 (9th Cir.1996). Handcuffing is not part of a typical *Terry* stop and the use of firearms increases the seriousness of the stop. *Washington v. Lambert,* 98 F.3d 1181, 1188 (9th Cir.1996). In addition, forcing a suspect to lie down on the ground is exceptional force in a *Terry* stop. *United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir.1990). Before exceptional force may be used against a suspect during a *Terry* stop, reasonable justification must exist. *Alexander v. County of Los Angeles,* 64 F.3d 1315, 1321 (9th Cir.1995). Exceptional force used during a *Terry* stop has been upheld where circumstances warranted use of such force. *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982) (use of handcuffs upheld where defendant was suspected of committing armed bank robbery); *United States v. Patterson,* 648 F.2d 625, 632–33 (9th Cir.1981) (use of police car to prevent defendant's car from moving upheld to promote safety of law enforcement officer).

█ Where, among other circumstances, a warning was sounded by a lookout, weapon were seized and a person fled from the residence, reasonable justification for the use of exceptional force in detaining Meza–Corrales and Bridges existed.

The motions to suppress based upon unlawful detention are denied as to both defendants.

### Protective Sweep and/or Exigent Circumstances

In light of the situation at that time, agents decided to conduct a protective sweep of the house.

█ A protective sweep of premises is permissible where articulable facts exist which, taken together with the rational inferences from those facts, would warrant reasonably prudent officers in believing that probable cause existed to believe that a crime was being committed and that "there might be other persons on the premises who could pose a danger to them." *United States v. Valles–Valencia,* 811 F.2d 1232, 1236 (quoting *United States v. Gardner,* 627 F.2d 906, 919–10 (9th Cir.1980)), *amended by* 823 F.2d 381 (9th Cir.1987). At the time the protective sweep was conducted, the agents possessed probable cause.

In addition, the Ninth Circuit has recognized that a warrantless entry may be permissible where exigent circumstances exist. The linchpin of an exigent circumstances search "is the need for quick action in an emergency setting." *Murdock v. Stout,* 54 F.3d 1437, 1440 (9th Cir.1995). Exigent circumstances has been defined as "those circumstances that would cause a reasonable

person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Murdock,* 54 F.3d at 1441 (quoting *United States v. Lai,* 944 F.2d 1434, 1442 (9th Cir.1991)). In addition to the presence of exigent circumstances, probable cause to believe that criminal activity is occurring must also exist. *Id.* Again, agents possessed the requisite probable cause.

 Whether the actions of the agents are conceptualized as a protective sweep or an exigent circumstances search, their conduct did not violate Meza–Corrales' Fourth Amendment rights.

In any event, no evidence was observed during this brief sweep and no prejudice to either defendant has been demonstrated to stem from this sweep. *Gerstein v. Pugh,* 420 U.S. 103, 120, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

Defendant Meza–Corrales' motion to suppress evidence based upon unlawfulness of the protective sweep is denied.

### Voluntariness of Meza–Corrales' Consent

Even though the Magnolia residence was owned by both Meza–Corrales and Charmagne, because 1) agents never acted upon Charmagne's consent to a search of the residence until after Meza–Corrales consented, and 2) her consent was conditioned upon the agents receiving the consent of Meza–Corrales, it is Meza–Corrales' consent which is dispositive of this issue.

 The government bears the burden of proving that consent was freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent was given must be determined from the totality of the circumstances. *Illinois v. Rodriguez,* 497 U.S. 177, 183–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

The Ninth Circuit has repeatedly articulated factors to be considered in determining whether a voluntary consent was given. These include (1) whether the person was in custody; (2) whether officers had weapons drawn; (2) whether the Miranda rights had been administered; (4) whether the person was informed of his or her right to refuse to consent; and (5) whether the person was told that a search warrant could be obtained. *See, e.g., United States v. Chan–Jimenez,* 125 F.3d 1324, 1327 (9th Cir.1997); *United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995), *cert. denied,* 516 U.S. 1152, 116 S.Ct. 1030, 134 L.Ed.2d 108 (1996).

 None of these factors are by themselves decisive. For example, there is no Fourth Amendment requirement that the police notify a lawfully seized person that he or she has the right to leave before a valid consent to search can be obtained. *Ohio v. Robinette,* 519 U.S. 33, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Here, as previously discussed, agents lawfully detained Meza–Corrales while investigating this matter. Whether the person from whom consent was sought realized that he or she had a right to refuse a request to search is also but one of the totality of circumstances to be considered. *Schneckloth,* 412 U.S. at 248–49. Meza–Corrales testified that, at all times, he knew that he had the right to refuse consent. He testified that he had previously been at a residence when a search warrant was executed there. Nor is the mere statement that a search warrant could be obtained dispositive of the issue. As the Ninth Circuit stated in *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990): "[C]onsent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue." Here, based on preliminary steps to obtain a search warrant, the agent's statement concerning intent to obtain a search warrant was not mere rhetoric. In addition, for reasons previously discussed, by the time Meza–Corrales consented, the agents likely possessed sufficient information to obtain a search warrant. The absence of Miranda warnings does not invalidate consent. *United States v. Torres–Sanchez,* 83 F.3d 1123, 1130 (9th Cir.1996).

Although the officers demonstrated significant force in the method by which they de-

tained Bridges and Meza–Corrales, in their manner of directing Charmagne and Meza–Corrales to exit the house, in their display of weapons during the securement of the scene, and during their protective sweep, Meza–Corrales and Charmagne immediately thereafter both refused consent to search. Meza–Corrales' initial refusal after this show of force indicates that he was not in awe of the police. Considering this totality of circumstances, Meza–Corrales' consent was voluntary. There is more, however.

Meza–Corrales testified that he consented only because the agents threatened to arrest Charmagne. If, as Meza–Corrales claims, the agents told him that Charmagne would be arrested if (1) Meza–Corrales refused to consent, and (2) drugs were thereafter found in the house, his consent would clearly be involuntary. *See, e.g., United States v. Hatley,* 15 F.3d 856, 858 (9th Cir.1994). In resolving this issue, the court must necessarily evaluate all of the evidence, including Meza–Corrales' testimony, both on direct and cross-examination.

As a threshold matter, defense counsel objected to the scope of the government's cross-examination of the defendant because it exceeded the scope of direct examination. Some of defense counsel's objections were overruled, although at least one was sustained.

Rule 611(b) of the Federal Rule of Evidence states: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." The Supreme Court has stated that, when a defendant testifies, "his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). The scope of cross-examination may not be impermissibly restricted by skillfully confined direct examination. As stated in *United States v. Hearst,* 563 F.2d 1331, 1340 (9th Cir.1977):

Nowhere in this rule is there even a suggestion that the waiver and permissible cross-examination [of the defendant] are to be determined by what the defendant actually discussed during his direct testimony. Rather, the focus is on whether the government's questions are "reasonably related" to the subjects covered by the defendant's testimony.

*See also United States v. Cuozzo,* 962 F.2d 945, 948 (9th Cir.1992).

Many important conflicts existed between the testimony of the defendant and that of the agents. Meza–Corrales testified that agents entered the house and removed him. Agents insisted that Meza–Corrales was ordered from the house that and he eventually complied.

Meza–Corrales testified that as soon as he came into contact with agents, he was advised of his *Miranda* rights, whereupon he asked for an attorney. An agent testified that Meza–Corrales was not advised of his *Miranda* rights until after the cocaine was discovered in the kitchen. Meza–Corrales' account is suspect in that at the time he claims he was advised of his rights, no drugs had yet been discovered, and there was no specific crime for which he could reasonably have been placed under arrest.

Meza–Corrales also testified that, before being seized in the residence, he had been in the backyard but had not tried to flee. Rather, according to Meza–Corrales, he was merely running to catch up with Mark Simmons to ask Simmons why he was running away.

Meza–Corrales testified that he did not remember the razor blade or cutting agent being located inside his home.

Most importantly, Meza–Corrales testified that the reason why he consented was because agents threatened to arrest both him and Charmagne if he did not consent. This testimony was directly contradicted by the agent who obtained Meza–Corrales' consent. That agent testified that the agents never intended to arrest Charmagne and never threatened to arrest either Charmagne or Meza–Corrales for withholding consent. It is significant to note that agents candidly admitted that one agent, Agent Hugh Murray, had shouted into the house for both

Charmagne and Meza–Corrales to come out and that when Charmagne came to the door, Agent Murray pulled her out the door.

Charmagne's testimony, in some respects, corroborated that of Meza–Corrales. During Charmagne's testimony, she testified that she did not have contact with any of the individuals whom agents had observed come to the residence that day. Charmagne explained that Meza–Corrales never wanted her to have contact with his friends because they were, in her words, "perverts." She also testified that she was unaware of the large sum of money discovered by agents located on the master bedroom bed which she said she had been making when agents arrived at the house.

■ Considering all relevant evidence presented, the court finds that Francisco Meza–Corrales was not threatened with the arrest of Charmagne and that he knowingly and voluntarily consented to the search of the Magnolia residence. His motion to suppress based on the alleged involuntariness of his consent is denied.

### Conclusion

IT IS HEREBY ORDERED that the motions to suppress evidence based upon the lawfulness of the defendants' detention, the protective sweep, and the involuntariness of Meza–Corrales' consent are **DENIED.**