**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN FRUNZ,

*Plaintiff-Appellee,*

v.

CITY OF TACOMA, a municipal corporation; TACOMA POLICE DEPARTMENT; ALAN MORRIS, TPD Officer, in his individual capacity; GARY T. STRIL, TPD Sergeant; DAVID ALRED, TPD Officer, in his individual capacity,

*Defendants-Appellants.*

No. 05-35302

D.C. No.
CV-03-05709-RBL

ORDER

Filed January 16, 2007

Before: Alex Kozinski and Ferdinand F. Fernandez, Circuit Judges, and Cormac J. Carney,* District Judge.

---

## ORDER

Defendants have responded to our order to show cause. *See Frunz* v. *City of Tacoma*, 468 F.3d 1141, 1147 n.10 (9th Cir. 2006). They argue that their appeal wasn't frivolous because they reasonably relied on relevant case authorities, notably, *Murdock* v. *Stout*, 54 F.3d 1437 (9th Cir. 1995). We quote at length from the response:

> Like the instant case, the situation in *Murdock* began with a call from a neighbor who reported

---

*The Honorable Cormac J. Carney, District Judge for the Central District of California, sitting by designation.

433

suspicious activity. But the initial neighbor's report in *Murdock* provided the officers with far less information than the report by Mr. Staples in the instant case. In *Murdock*, all the neighbor reported was "that a passerby had told him that he saw a young person run from" Murdock's house. Officers responded and found the house secure, except for a sliding door at the rear of the house, which was open approximately 8 to 10 inches. *Id.* at 1339. The *Murdock* court stated that the neighbor's report and open door were not enough to establish probable cause and exigent circumstances, but that those two facts, coupled with indicia that someone should be home and was not answering, were sufficient:

> The police officers did not, however enter the house based only on the open door and the neighbor's report. They observed several indications that a resident was or should have been in the residence. The lights were on and the television was on, in addition to the door being open. The officers prudently attempted to make contact with the resident, no doubt to make sure the resident was safe in light of the officers' concern that a burglary or some other crime might have occurred. Officer Jacobson shouted twice, but received no answer, nor did any resident answer the telephone. *These additional pieces of information, indicating that a resident should have been home, but was not responding, combined with the earlier report of suspicious activity and the presence of the open door tip the scales to supply the officer with probable cause to believe that some criminal activity had occurred or was occurring or that a*

*resident in the house might have been in danger or injured.*

(emphasis added) *Id.* at 1442. Similarly, in this case, the officers did not act solely on the information reported by Mr. Staples.

As outlined above, the neighbor's report in this case provided the officers with far more detailed and credible information than the neighbor's hearsay report of suspicious activity in *Murdock*. In this case, the officers were told by Mr. Staples that Doug Quandt, the owner of the house, had spoken to him just a few days earlier and had asked him to watch the house while Quandt was out of town. ER 139-141. Quandt also specifically told Mr. Staples that the house was going to be empty while he was gone. *Id.* In its opinion, this court states that the officers did not gain any additional information when they responded to the house the second time. Defendants respectfully submit that this is not an accurate statement of the facts. As documented in the CAD, when the officers were dispatched the second time, they immediately responded to the Staples' residence. *See* ER 32 (reflecting that officers arrived at the Staples residence at 14:56:29). After speaking with Mr. Staples for a few minutes, the officers then went to 1708 South 40th Street. *Id.* (reflecting that, at 14:59:01, the officers changed location from 1712 South 40th Street (the Staples' residence) to 1708 South 40th Street). When they arrived at 1708 South 40th Street, the officers saw three people inside a house that was supposed to be empty. ER 334. Further, these three people were dirty and unkempt and appeared to be "street people." *Id.*

In *Murdock*, the court found probable cause and exigent circumstances based on a neighbor's hearsay

report of suspicious activity, an open door, and indi-cia that someone should be home but was not responding to the officers' calls. In this case, the officers had a detailed, eyewitness report from the neighbor that the house was supposed to be empty, repeated reports of people inside the house, indicia suggesting that these people had concealed them-selves in the house during the officers' first response, and during the officers' second response, visual confirmation of people inside the house whose appearance was inconsistent with the surroundings. Based on the similarity of these facts with the cir-cumstances in *Murdock*, the defendants in good faith believed that *Murdock* supported the constitutional-ity of their actions.

Response at 9-12.

The nub of this argument appears to be that, as in *Murdock* (and contrary to the facts we recited in our opinion), the offi-cers here obtained independent verification of Staples's account before entering: They observed three individuals, whose appearances were inconsistent with their surroundings, inside the house. Defendants reiterate this claim a few pages later: "The officers activated the beeper [notifying the station of an emergency situation], because when they arrived at the Quandt home, they observed three people inside who appeared to be 'street people.' ER 334." Response at 21-22.

The record belies this argument. ER 334, on which defen-dants rely, is part of Sergeant Stril's testimony, and Stril made his observations only after the officers had entered the house:

> Q. After you heard the radio traffic that three were detained, what did you do?
>
> A. I went into the residence to see what was going on.

Q.   What do you recall seeing?

A.   The officers had three people on the kitchen floor handcuffed. I inquired of the circumstances. And I made some observations of my own. The people I saw in the house looked like, I will use the term "street people." They were roughly dress [sic], unkempt, not clean. They did not look like your typical householder.

ER 334. The only evidence as to what the officers did see prior to entering undercuts defendants' assertion that the officers saw "street people" inside: Officer Alred testified only that he "saw movement in the kitchen . . . and . . . movement at the window as I passed the kitchen." ER 406.

Defendants' argument that the police entered the house because they saw "street people" inside was prominently raised in their brief as well. *See* Brief of Defendants-Appellants at 6 ("This time, when the officers arrived, they could see people inside the house—two men and a woman. Dkt. 105/ER 408 (Alred testimony).[1] The people in the house looked like 'street people'—they were dirty, unkempt, and roughly dressed. Dkt. 104/ER 334."). As was their argument that this supposed fact made their case similar to *Murdock*.

Because defendants' argument was unsupported by the record, we found *Murdock* inapplicable. We explained our reasoning, and provided a correct recitation of the facts. We issued the order to show cause in part to give defendants an

---

[1]Alred's testimony suffers the same deficiency as Stril's: It refers to observations that could not have influenced Alred's decision to enter the house because they were made after he was already inside: "What I specifically remember, *as I entered the open door to the kitchen*, there was three individuals. I had a man, I had a second man, and I had Ms. Frunz." ER 408 (emphasis added). The door to the kitchen was an inside door, connecting the kitchen to the laundry room, ER 405-06; Alred could only pass through that door after having entered the laundry room from the outside.

opportunity to explain or retract their earlier misstatement. Defendants did not do so. Instead, they twice repeated it.

Nor is this the only place where defendants are in error about the facts. In footnote 2 of the response, defendants claim "it was undisputed that Frunz did not drive to the house on the day of the incident. ER 104." The page of the record defendants cite, ER 104, does not support this proposition. It contains the testimony of Frunz's divorce lawyer that he drove her to the house on the prior Monday and Wednesday, but he says nothing about driving her on Saturday, the day in question. In fact, he does say *on the very same page* that he was not involved in any of the Saturday events. ER 104.[2]

Defendants hotly dispute our suggestion that the police could profitably have questioned Staples about his contacts with Frunz's husband: "The court mistakenly suggests that the officers could have further questioned Staples regarding Staples' last contact with Quandt . . . . However, Staples testified that his conversation with Quandt occurred just two days prior to the incident. ER 139." Response at 19 n.3. Defendants also claim that "*the officers were told by Mr. Staples* that Doug Quandt, the owner of the house, had spoken to him just a few days earlier . . . . ER 139-141." Response at 10 (emphasis added). ER 139-141 say no such thing; Staples nowhere testified he had told the police *when* he last talked to the husband. Alred testified that he did not remember the first call at all. ER 403. Neither Alred nor Stril said anything about a conver-

---

[2]Footnotes 2 and 4 of the response also recite facts highly prejudicial to Frunz which, while true, are irrelevant because there is no evidence the police were aware of them at the time they entered her home. As such, they have no possible bearing on probable cause, the need to obtain a warrant or qualified immunity—the issues on which this appeal turned. We thoroughly reviewed the record at the time we ruled on the case and were therefore aware of the facts. We omitted them from our opinion because they played no role in our legal analysis. It is unclear why defendants believed these facts were relevant to the issues raised by the order to show cause.

sation with Staples during the second call. *See* p. 439 *infra*. Alred's partner, Officer Morris, did not testify, nor did any other officer involved in the arrest. The LESA CAD incident report states only that "OCCUPANT IS OUT OF STATE AND ASKED THEM TO WATCH HOUSE." ER 31. So far as the record reflects—and contrary to defendants' assertion —the police did not know on the day of the incident whether Staples had talked to the husband weeks or even months earlier.[3] It would indeed have been useful for the officers to question Staples on this point.

At page 22 of the response, defendants claim that "[t]he officers suspected that the occupants had concealed themselves during the first visit." Defendants cite nothing supporting this assertion and we know of nothing in the record to support it. On pages 10-11, defendants suggest that the officers "spoke to Staples for a few minutes" during the second call and obtained new information from him at that time. The record shows that the officers went to Staples's home, ER 32, but there is no evidence that they spoke to Staples, much less that they obtained additional information from him.

Defendants claim "[i]t is undisputed that the officers did check for warrants as soon as they had obtained enough information (e.g. name and birthdate) to do so. ER 336, 383, 411." Response at 22 n.7. The record contradicts the assertion that the police needed a birthdate to check for warrants; Stril testified that "approximate age" was enough. ER 383. The officers had plaintiff's first name and could have asked Staples for her

---

[3]In fact, the record shows that Frunz's husband had been out of the house for quite a bit longer than the two days suggested by Staples' testimony. Frunz's divorce lawyer testified that on November 7th—eleven days before the incident in question—he received a call from the husband's divorce lawyer, a call he returned two days later. The husband's lawyer said that his client was willing to give up the house and would mail the keys *from California*. ER 102-03. In light of this evidence, the jury could have concluded that Staples was tailoring his story to justify his conduct.

(or her husband's) last name; neighbors usually have such information. Staples appears to have known both last names. ER 139. And Staples had given the police her approximate age. ER 31 (describing plaintiff as "HIS EX WIFE, SUSAN, W/F, 40's"). The officers never testified that they checked for warrants at the earliest opportunity.

The defendants' response also contains other statements that are not entirely accurate, of which the following is an example: "The court mistakenly suggests that the officers may have 'slammed' Frunz to the floor, but Frunz testified that the officers told her to get down onto the floor and she complied. ER 282-283." Response at 22 n.6. What we actually said was: "The police ordered or slammed *the occupants* to the floor." 468 F.3d at 1142 (emphasis added). And we were not mistaken.

While Frunz testified that she was ordered to the floor, another occupant, Joseph Resutek, testified he was slammed:

> Q:   When you were cuffed, how did the officer —
> how would you describe the officers' treatment
> of you?
>
>    . . . .
>
> A.   They come in, you know, slammed me to the
> floor, put the flex cuffs on me and hauled me
> outside.

ER 400.

We have cited some, but by no means all, of the instances where defendants' response to the order to show cause distorts the record—much as did the brief on the merits. Legal arguments depend on facts and so lawyers have a responsibility to recite the record fairly and accurately. Defendants lost on the merits in no small part because we did not accept their

view of the facts. This should have alerted defendants and their lawyers that their record citations may have been defective. A simple check of the record would have disclosed the problem and given defendants an opportunity to correct their earlier misstatements. Had they done so, we would have given them the benefit of the doubt.

In light of the above, we conclude that defendants and their counsel have not shown cause why sanctions should not be imposed pursuant to Fed. R. App. P. 38. We therefore order as follows:

**1.** Defendants shall pay plaintiff's attorney's fees and double costs. The parties shall meet within 30 days (in person or by telephone) to agree on the amount. If they fail to agree, the matter is referred to the Appellate Commissioner for a determination of the amount.

**2.** No later than 10 days from the date of this order, defense counsel shall serve a copy of this order, together with our opinion, on each member of the Tacoma City Council and on Eric A. Anderson, the Tacoma City Manager.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2007 Thomson/West.