**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN FRUNZ,
                    *Plaintiff-Appellee,*

           v.

CITY OF TACOMA, a municipal
corporation; TACOMA POLICE
DEPARTMENT; ALAN MORRIS, TPD
Officer, in his individual capacity;
GARY T. STRIL, TPD Sergeant;
DAVID ALRED, TPD Officer, in his
individual capacity,
                    *Defendants-Appellants.*

No. 05-35302

D.C. No.
CV-03-05709-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
October 25, 2006—Seattle, Washington

Filed November 13, 2006

Before: Alex Kozinski and Ferdinand F. Fernandez,
Circuit Judges, and Cormac J. Carney,* District Judge.

Opinion by Judge Kozinski

*The Honorable Cormac J. Carney, District Judge for the Central District of California, sitting by designation.

18643

## COUNSEL

Jean P. Homan, Assistant City Attorney, Tacoma City Attorney's Office, Tacoma, Washington, for the defendants-appellants.

Hugh J. McGavick, Law Offices of Hugh J. McGavick, Olympia, Washington, for the plaintiff-appellee.

## OPINION

KOZINSKI, Circuit Judge:

The facts are remarkable. Plaintiff, Susan Frunz, and her two guests were in Frunz's home in Tacoma, Washington, when police surrounded the house, broke down the back door and entered. The police had no warrant and had not announced their presence. Frunz first became aware of them when an officer accosted her in the kitchen and pointed his gun, bringing the barrel within two inches of her forehead. The police ordered or slammed the occupants to the floor and cuffed their hands behind their backs—Frunz for about an hour, until she proved to their satisfaction that she owned the house, at which time they said "never mind" and left.

As the officers doubtless knew, physical entry into the home is the "chief evil against which the wording of the Fourth Amendment is directed." *United States* v. *United States District Court*, 407 U.S. 297, 313 (1972); *see also Murdock* v. *Stout*, 54 F.3d 1437, 1440 (9th Cir. 1995) ("[P]rotection of individuals from unreasonable government intrusion into their houses remains at the very core of the Fourth Amendment."). To safeguard the home, we normally require a warrant before the police may enter. "The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals . . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home." *McDonald* v. *United States*, 335 U.S. 451, 455-56 (1948); *see also Groh* v. *Ramirez*, 540 U.S. 551, 560 (2004). What extraordinary circumstances justified sundering the privacy and protection of Frunz's home without a warrant?

Earlier that afternoon, one Clinton Staples called 911 and reported that his neighbor, who was out of town, had asked Staples to keep an eye on his house. Staples had observed "Susan," the neighbor's ex-wife, arrive in a gray Toyota with Washington license plate 928 EKR; she was in the house and the car was parked out front. Officers David W. Alred and Alan R. Morris arrived a few minutes later and checked the house for signs of break-in. They then knocked at the front door and got no answer. Before leaving, the police told Staples to call back if he saw further evidence that the house was occupied.

About half an hour later, Staples again called 911 to report that Susan was "now inside the house" and had just answered the door to a visitor. Staples also mentioned that Frunz was subject to a restraining order which prohibited her from being at that location. In fact, Frunz had been ceded the house during the divorce proceedings. And, while she was restrained from going to her ex-husband's residence, her ex had moved to California. Frunz had been living in the house for the better part of a week.

Alred and Morris, joined by other officers (including Sergeant Gary T. Stril) arrived at the scene forty minutes later. They surrounded the house and, without further investigation or observation, entered and subdued the occupants as described above. The two guests were able to prove their identity and were found to have no outstanding warrants. They were uncuffed and ordered to leave. The officers left Frunz in handcuffs because she was unable to direct them to her picture ID or to paperwork showing that she owned the house. Frunz testified that she was unable to do so because she was "terrified," and because Officer Morris kept threatening her and telling her to "shut up."[1] She was released only

(Text continued on page 18649)

---

[1] Q. And was there one officer who paid particular attention to you when you were in the living room?

A.  Yes.

Q.  What officer would that be?

A.  Officer Morrison — Morris.

. . . .

Q.  And how did he treat you?

A.  He was terrible. He just—

Q.  Why, or how?

A.  He kept interrogating me. He would ask me, well, what is your name? And I would tell him it's Susan Frunz. And he goes, you're a burglar. We're going to take you to jail. They kept saying that over and over, and then when I would answer him anything about anything, he would tell me to shut up. Then he would ask me where my ID was.

Q.  And would you answer him?

A.  I'd say I don't know. And I didn't know where it was.

. . . .

Q.  And did he tell you to shut up?

A.  Repeatedly.

Q.  After he asked you questions, and then you answered? Is that a yes?

A.  Yes. Yes.

Q.  Were you crying?

A.  Yes, sir.

Q.  Did any officer do anything to help you dry your eyes?

A.  There was one officer, I don't know, he said I — he said, "Can I get a tissue to wipe her face?" Because I was really crying, and I don't know who wouldn't be. And Officer Morris said, no, that's not necessary. And I kept telling him that I was cold. And it just — I felt like that it was never going to end. I would — you know, I didn't know what was going to happen next.

Q.  Did he read you your Miranda rights?

after the officers were able to reach her divorce lawyer, who confirmed that Frunz owned the house.

Frunz sued Alred, Morris and Stril under 42 U.S.C. § 1983, claiming constitutional violations for unlawful entry and search of her home, and for use of excessive force by Alred.[2] The jury found against all defendants on all counts, and awarded $27,000 in compensatory damages and $111,000 in punitive damages.

The officers appeal, claiming the verdict is not supported by the evidence and that they are, in any event, entitled to qualified immunity. The nub of their argument is that their warrantless entry was justified—or that they could reasonably have thought it justified—by a burglary in progress. And, having determined that they needed to enter the house in order to catch the suspected felons red-handed, they were entitled to break down the door, draw their weapons, handcuff the occupants and conduct a protective sweep of the house.

---

A.  Yes, he did. And I did not acknowledge them.

Q.  Why not?

A.  Because I didn't feel like I had any rights, anyway, so why should I mention something that — you know.

Q.  You mentioned that he threatened to take you to jail. Did you respond to that?

A.  In the end, towards the end, I just told him, I said "Just take me to jail and we will sort this out," so it could just end the nightmare.

Q.  Did it frighten you to be alone in the house with all of these police officers?

    . . . .

A.  Yes.

[2]She also sued the city and the police department, but the district court granted summary judgment for the city. Frunz subsequently amended her complaint to state claims only against the three officers.

**[1]** Not so. While the information provided by the neighbor suggested that unauthorized people may be in the house, it also made clear that this was not a break-in by strangers. Staples identified one of the occupants as the neighbor's ex-wife, describing her by first name, race and approximate age. The officers confirmed that there had been no break-in when they inspected the property during their first visit, and nothing had changed when the officers stormed the home an hour and a half later.[3] During this first visit to the property, the officers did not draw their weapons, did not call for back-up and did not break down the door. Quite reasonably, they knocked and sought to have a conversation with whoever was inside.

**[2]** Nothing at all had changed when the vigilant Mr. Staples made his second call. (He did provide new information about the restraining order, but this makes no difference, for reasons we explain below.) If the officers thought it prudent to knock on the door the first time, they had no possible justi-

---

[3]Officer Alred testified that, as he was about to enter, he noticed a wide-open door and window, both of which were closed when he had inspected the house earlier. Alred had not mentioned the open door or window in his affidavit in support of summary judgment, or in his responses to interrogatories. The jury could have found that Alred lied, as his story conflicted with his testimony that he remembered nothing about his earlier check of the house. There were many other problems with Alred's testimony, including his insistence that one of Frunz's guests had told him he had gained entrance to the house by pushing open the window and reaching in to open the door. The jury could have found this account inconsistent with the fact that the police released the guest rather than detaining him after he had supposedly confessed to burglary. Alred also claimed that he never pointed his gun at Frunz, yet he admitted that he was executing a plan to use a "draw and direct" technique, a procedure previously described as "pointing a firearm at somebody." "It wasn't like we were going to stroll into the house," Alred testified. "We were going to make an entry into the house. We were going to contact individuals using a draw and direct. We were going to put them on the floor, and we were going to take them into custody and determine what kind of crime we had here." The jury could reasonably have found that's exactly what Alred did.

fication for breaking down the door and drawing their weapons the second time.[4]

**[3]** The officers point to the exigency of the situation, but there was none. Normally, when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance. In such exigent circumstances, the police are entitled to enter immediately, using all appropriate force. But it was clear from the information available to the officers here that they were dealing, at worst, with some sort of spousal property dispute. Even if it was technically a burglary—and it's far from clear that the officers had probable cause to suspect this—it did not present the same risk of confrontation or flight as a break-in by strangers. The fact that the suspected intruder had a personal relationship with the person thought to own the house raised the possibility that she was there with his permission or had gained possession as a result of the legal proceedings between them. The officers also knew that Staples had watched Frunz drive up to the house, park out front and open the door to a visitor. These signs of open and lawful occupancy made it far less likely that what was going on was a burglary and materially diminished the risk of violent confrontation. Staples, moreover, not only identified Frunz by name, sex, race and age, but also gave the description and license plate number of her car. Had she managed to flee the 900-square-foot house that was by then surrounded by at least five police officers, she could easily have been found by contacting her ex-husband or her divorce lawyer, or by tracking her car registration. The fact that it took the police forty minutes to respond to Staples's second call confirms the absence of exigency. The delay was no doubt caused by the low priority the communications officer

---

[4]Indeed, they had *less* justification. During his second call, Staples mentioned that Susan had opened the front door to a visitor. Burglars don't usually open the front door when a visitor knocks.

assigned to the call by coding it as a "security check" rather than a "burglary in progress."[5]

**[4]** The only new fact the police knew at the time of the second call that they hadn't known the first time was that Frunz might be subject to a restraining order. But the officers in their testimony and their counsel in summation took the position that the restraining order "ha[s] no relevance to this case at all." And with good reason: The officers never looked at the restraining order, as they were clearly required to do, if they wished to rely on it. *Beier* v. *City of Lewiston*, 354 F.3d 1058, 1069 (9th Cir. 2004). Defendants' entire case at trial was built on the theory that they were facing an emergency so that they had no time to obtain a warrant or conduct further investigation—indeed, that they had no choice but immediately to break into Frunz's home unannounced, guns in hand, and shackle the occupants.

**[5]** There was, in fact, much else the officers could have done. They could have questioned the neighbor as to his last contact with the husband, in which case they may have learned that the husband had moved out of the house and was living in another state. They could have tried to get a phone number for the husband and asked him whether his ex-wife was authorized to be in the house. They could have tried to track down the restraining order.[6] They could have checked to

---

[5]The communications officer who processed Staples' calls testified that the coding is based only on the caller's report and that "it's possible that the officers will gain information in the course of responding to the call which would indicate that it's something entirely other than what the communications officer said it was." Here, however, the officers gained *no* new information when they arrived at the scene. They did not question the complainant, and they made no additional observations when they arrived at the property. Rather, they must have made the decision to force their way into the house based entirely on the information in the two dispatch reports, as they signaled their intent to enter five seconds after arriving at the house.

[6]Had they done so, they would have learned that no restraining order had been entered into the electronic database, because the divorce lawyers

see if the grey Toyota was still in front of the house and run a check of the license plate. They could have asked the neighbor for Susan's last name and checked for outstanding warrants or any other indication that she might be armed and dangerous. They could have knocked at the door, as they had done just an hour and a half earlier, and politely asked the occupants whether they were entitled to be there. Most importantly, reasonable officers would have tried to obtain a warrant—a telephone warrant if they believed it was urgent—and monitored the house to see if anyone went in or out.[7] Bursting through the back door unannounced with guns drawn and handcuffing the occupants—the owner for a full hour—was neither necessary nor reasonable in these circumstances.[8]

---

apparently neglected to take the necessary steps. While this would not have disproved the existence of a restraining order, it would have cast doubt on the accuracy and timeliness of other information provided by Staples.

[7]Sergeant Stril admitted as much:

    A.    I suppose a person could get a search warrant to investigate a burglary. It's not common practice.

    Q.    The house was surrounded and nobody was going anywhere, were they?

    A.    I wouldn't have thought so.

    Q.    Curtains were open?

    A.    As far as I know.

    Q.    Do you have a hazy memory about that?

    A.    I remember being in the living room and there were no lights on and there was enough light to see. So certainly there were not any thick curtains closed.

[8]For that matter, the officers had no reasonable basis for keeping Frunz in shackles an additional forty minutes after they released her guests. Once they had determined that the guests were not guilty of burglary, it's hard to imagine what crime they could reasonably have suspected she had committed. The ordeal would have ended much sooner, had the officers taken off Frunz's handcuffs at that time and allowed her to search for her ID, keys or paperwork showing that she was entitled to be in the house.

No reasonable officer familiar with the law of searches and seizures could have thought otherwise.

Defendants rely on *Murdock*, 54 F.3d at 1440-41, but that case provides them no help. The only similarity between the two cases is that both plaintiffs owned houses where police entered without a warrant. In *Murdock*, however, unlike our case, "[t]he facts known to the police officers indicated that a resident was not responding when the circumstances inside the house strongly suggested that a resident should have been present." *Id.* at 1442.[9] The police thus had reason to believe that "a resident in the house might have been in danger or injured." *Id. Murdock* is also distinguishable because the officers caused no property damage on entry, and the majority believed (wrongly it turns out, *see LaLonde* v. *County of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000)) that they therefore needed to show only a "mild exigency" to justify the entry. *Murdock*, 53 F.3d at 1442. We have found no authority even remotely supporting the notion that officers confronted with the situation here were entitled to ignore the constitutional requirement of a warrant and probable cause, or to conduct themselves as the jury must have found they did once they were inside the house. No reasonable lawyer would have advised the defendants otherwise.

In short, we must ask: Why is this case here? There may have been some justification for going to trial because there were disputed questions of fact about how the officers behaved during the course of the intrusion into Frunz's house. But a jury made up of seven members of the community heard the evidence and unanimously ruled in Frunz's favor. By not only finding defendants liable, but also imposing punitive damages, the jury determined that the officers acted in reckless or malicious disregard of plaintiff's constitutional

---

[9]Indeed, *Murdock* expressly held that the officers did not have probable cause to enter the house based merely on a neighbor's report of suspicious activity and an open door. 54 F.3d at 1441.

rights. Only the most misguided optimism would cause defendants, and those who are paying for their defense, to appeal the verdict under these circumstances. Surely, the citizens of Tacoma would not want to be treated in their own homes the way the jury found officers Stril, Morris and Alred treated Frunz and her guests. A prompt payment of the verdict, accompanied by a letter of apology from the city fathers and mothers, might have been a more appropriate response to the jury's collective wisdom.[10]

**AFFIRMED.**

---

[10]Defendants and their counsel shall show cause within 14 days why they should not be assessed double costs and attorney's fees for filing a frivolous appeal. Fed. R. App. P. 38.