**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SARA LOWRY,
    *Plaintiff-Appellant*,

v.

CITY OF SAN DIEGO,
    *Defendant-Appellee.*

No. 13-56141

D.C. No.
3:11-cv-00946-MMA-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Michael M. Anello, District Judge, Presiding

Argued and Submitted En Banc January 18, 2017
San Francisco, California

Filed June 6, 2017

Before:  Sidney R. Thomas, Chief Judge, and Alex
Kozinski, Diarmuid F. O'Scannlain, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton, Carlos T. Bea,
Jacqueline H. Nguyen, Paul J. Watford, Andrew D.
Hurwitz and John B. Owens, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Chief Judge Thomas

# SUMMARY[*]

### Civil Rights

The en banc court affirmed the district court's summary judgment in favor of the City of San Diego in an action brought pursuant to 42 U.S.C. § 1983 alleging that the City's policy of training its police dogs to "bite and hold" individuals resulted in a violation of plaintiff's Fourth Amendment rights.

Plaintiff alleged that during the execution of a search by police officers, a police canine attacked plaintiff in her office where she was sleeping, and bit her upper lip.

The en banc court held that there were no genuine disputes of material fact regarding plaintiff's claim. From the perspective of a reasonable officer on the scene, the type and amount of force inflicted was moderate, the City had a strong interest in using the force, and the degree of force used was commensurate with the City's interest in the use of that force. The en banc court concluded that the force used was not excessive and did not violate the Fourth Amendment. Because the officers' actions were constitutional, the City could not be held liable under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978).

Dissenting, Chief Judge Thomas noted that plaintiff was sleeping in the privacy of her office, when she was attacked and injured by a police dog trained to inflict harm on the first

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

person it encountered. He stated that a reasonable jury could find that the City of San Diego's use of a police dog was unreasonable under the circumstances presented.

## COUNSEL

Nathan A. Shaman (argued) and Jeffrey A. Lake, Jeffrey A. Lake A.P.C., San Diego, California, for Plaintiff-Appellant.

Stacy J. Plotkin-Wolff (argued), Deputy City Attorney; Daniel F. Bamberg, Assistant City Attorney; Jan I. Goldsmith, City Attorney; Office of the City Attorney San Diego, California; for Defendant-Appellee.

Denise L. Rocawich (argued) and Martin J. Mayer, Law Offices of Jones & Mayer, Fullerton, California, for Amici Curiae California Police Chiefs' Association, California State Sheriffs' Association, and California Peace Officers' Association.

Donald W. Cook (argued), Los Angeles, California, for Amicus Curiae National Police Accountability Project.

Vincent P. Hurley, Law Offices of Vincent P. Hurley, Aptos, California, for Amicus Curiae League of California Cities.

Nicole M. Threlkel-Hoffman and Steven J. Renick, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Amicus Curiae United States Police Canine Association and International Municipal Lawyers Association.

**OPINION**

CLIFTON, Circuit Judge:

When a burglar alarm in a commercial building was triggered shortly before 11:00 p.m. on a Thursday night, San Diego Police Department officers responded. Accompanied by a police service dog, Bak, the officers inspected the building and found a door to a darkened office suite propped open. Unable to see inside the suite, one of the police officers warned: "This is the San Diego Police Department! Come out now or I'm sending in a police dog! You may be bitten!" No one responded. The officers suspected that a burglary might be in progress and that the perpetrator was still inside the suite. After he repeated the warning and again received no response, one of the officers released Bak from her leash and followed closely behind her as they scanned each room. As he entered one of the rooms, the officer noticed a person laying down on a couch. Bak leapt onto the couch. Within seconds, the officer called Bak off, and the dog returned to the officer's side. The person on the couch was Plaintiff Sara Lowry. She had returned to the office after a night out drinking with her friends, and had accidentally triggered the alarm before falling asleep on the couch. During their encounter, Bak bit Lowry's lip.

Based on these facts, Lowry filed suit against the City of San Diego under 42 U.S.C. § 1983, alleging that its policy of training its police dogs to "bite and hold" individuals resulted in a violation of her Fourth Amendment rights. The district court granted the City's motion for summary judgment, concluding that Lowry had not suffered constitutional harm and that, even if she had, the City was not liable for her injury under *Monell v. Department of Social Services of New York*,

436 U.S. 658, 694 (1978). We agree that the use of the police dog under these circumstances did not violate Lowry's rights under the Fourth Amendment and thus affirm the summary judgment in favor of the City.

## I.  Background

A burglar alarm was triggered in a two-story office building in San Diego at approximately 10:40 p.m. on the night of Thursday, February 11, 2010. Three San Diego Police Department (SDPD) officers, Sergeant Bill Nulton and Officers Mike Fish and David Zelenka, along with Nulton's police service dog, Bak, arrived at the scene within minutes of receiving the call to investigate a burglar alarm. Approaching the building, the officers did not see anyone leaving the building or surrounding area. On the second-story balcony of the building, they saw an open door.[1]

After scaling the ground-floor gate, the officers determined that the open door led to Suite 201. Outside the suite, Sergeant Nulton yelled loudly, "This is the San Diego Police Department! Come out now or I'm sending in a police dog! You may be bitten!"[2] No one responded. He waited

---

[1] Lowry argues that there is a genuine dispute of material fact as to whether the door leading to Suite 201 was in fact open. As will be discussed below, we conclude that the district court did not abuse its discretion in ruling that Lowry had not presented admissible evidence to dispute the officers' testimony that the door was open when they arrived.

[2] Lowry contends there is a genuine dispute of material fact regarding whether Sergeant Nulton gave these warnings. As discussed below, we hold that the district court did not abuse its discretion in finding that Lowry had provided no admissible evidence to the contrary.

between 30 and 60 seconds and repeated the same warnings. Again, there was no response.

Faced with an open door to a darkened[3] office suite, knowing that the burglar alarm had been triggered and that they had received no response to their warnings, the officers—who had arrived at the scene within minutes— suspected that a burglary might be in progress and that the intruder could be lying in wait. Nulton released Bak into the suite to start searching the offices. Nulton followed closely behind Bak and swept the area with his flashlight. When Bak and Nulton entered the last office to be searched, Nulton noticed a purse on the floor and, shining his flashlight against the office wall, spotted a person under a blanket on the couch. At about that moment, Bak jumped onto the couch and bit the person on the lip. Nulton immediately called Bak off, and Bak responded, returning to Nulton's side.

The person on the couch was Sara Lowry. Although the officers were previously unaware of her presence, Lowry had been asleep on a couch in an office within Suite 201, where she worked. She had visited a few bars in the area with friends that evening and consumed five vodka drinks. Around 9:30 p.m., she returned to her office and fell asleep on the couch. She woke up to use the bathroom, instinctively heading towards the bathroom she typically used during business hours, which was in a neighboring suite occupied by a separate company. In the process of entering the

---

[3] Lowry argues that there is a genuine issue of fact regarding whether the office was dark. The district court concluded that Lowry did not submit admissible evidence sufficient to raise a genuine dispute of material fact regarding the degree of illumination inside Suite 201. We hold that the district court did not abuse its discretion, as discussed below.

neighboring suite, she triggered the burglar alarm. She returned to her office and fell back asleep on the couch, where she was still located when Nulton and Bak entered the room. In their encounter, Bak bit Lowry's upper lip, causing it to bleed. Officer Fish took Lowry to the hospital, where she received three stitches.

In this 42 U.S.C. § 1983 action, Lowry alleges that the City's policy and practice of training police service dogs to "bite and hold" individuals resulted in a violation of her Fourth Amendment rights. It is undisputed that SDPD trains police service dogs to "locate and control persons on command" by finding a person, biting them, and holding that bite until a police officer handler commands the dog to release the bite. Police dogs may be left on the bite "until the suspect can be handcuffed by the handler and be safely taken into custody." Prior to using a police service dog to search for a suspect, the City's policy requires a handler to consider: "(1) the severity of the crime; (2) the immediacy of the threat; and, (3) if the subject is actively resisting arrest."[4] When practical, handlers are expected to issue warnings before releasing a police service dog.

The district court granted the City's motion for summary judgment. Lowry timely appealed. A divided three-judge panel of this court reversed the summary judgment and remanded for further proceedings. *Lowry v. City of San Diego*, 818 F.3d 840 (9th Cir. 2016). We granted the City's petition for rehearing en banc. *Lowry v. City of San Diego*, 837 F.3d 1014 (9th Cir. 2016) (order).

---

[4] These factors are derived from *Graham v. Connor*, 490 U.S. 386, 396 (1989).

## II. Discussion

We review a district court's grant of summary judgment *de novo*. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). We must determine whether "taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact." *Id.* In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is "a pure question of law." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

Lowry alleges that the City's policy of training its police dogs to "bite and hold" resulted in a violation of her constitutional right against being subjected to excessive force. The use of excessive force by a law enforcement officer may constitute a violation of the Fourth Amendment's prohibition against unreasonable seizures of the person. Such a claim can be brought under 42 U.S.C. § 1983 and should be analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Lowry has not sued the police officers but only the City, asserting a single cause of action seeking to establish the City's liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). To prevail on her *Monell* claim, Lowry must establish that (1) SDPD's use of Bak amounted to an unconstitutional application of excessive force, and (2) the City's policy caused the constitutional wrong. *Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994) (citing *Monell*, 436 U.S. at 690–94).

Lowry contends that summary judgment should not have been granted to the City because there were genuine disputes

of material fact and because the district court abused its discretion in excluding evidence that could have established a genuine dispute of fact. She argues that the force used against her was unreasonable and excessive, in violation of the Fourth Amendment. She further asserts that the City's policy regarding the use of police dogs was itself unconstitutional and that it caused her injury. We disagree.

## A. Evidentiary Issues

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Lowry argues that the district court erred in granting summary judgment because there were genuine disputes of material fact. In determining whether the district court properly found that Lowry failed to raise genuine factual issues, we ask whether she "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities of Serv. Co.*, 391 U.S. 253 (1968)).

Lowry points to several purported factual disputes, notably whether the door to Suite 201 was ajar, whether the office within the suite was dark, and whether Sergeant Nulton provided a warning before he released Bak. The district court concluded that these were not genuine issues of fact because Lowry presented no admissible evidence to counter the three officers' testimony.

The officers testified that the door to the office suite was open. The only evidence offered by Lowry to the contrary was her own testimony, but, as the district court observed, she

did not "testify that she actually closed the door, but speculates that it did close because she knew it to be an automatically closing door." The court rejected that evidence as insufficient, finding that "she fail[ed] to offer admissible firsthand testimony" to contradict the officers' testimony.

The district court also concluded that Lowry's testimony as to the level of illumination in the suite was "entirely speculative." She offered no evidence contradicting the officers' account of the lighting within the interior of Suite 201 on the night of the incident. Indeed, Lowry testified in her deposition that it was "dark" in the suite when she went to sleep, and that there were no lights or computer screens illuminating the room.

As for whether the officers gave a verbal warning that the police dog would be deployed, all three officers testified to that effect. In response, Lowry testified that she did not hear such a warning. The district court concluded that Lowry's testimony to that effect did not create a genuine dispute as to whether a warning had in fact been given. The district court observed that she "lack[ed] proper foundation to testify to this fact because she was sleeping at the time" the warning was given. She was not, as a result, in a position to know whether a warning had been given.

"Evidentiary rulings made in the context of summary judgment motions are reviewed for abuse of discretion and 'can only be reversed if . . . both manifestly erroneous and prejudicial.'" *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006)). "Generally, a witness must have 'personal knowledge of the matter' to which she testifies." *Bemis v. Edwards*, 45 F.3d

1369, 1373 (9th Cir. 1995) (quoting Fed. R. Evid. 602).  It was not manifestly erroneous for the district court to conclude that Lowry lacked personal knowledge of events that she did not in fact witness or was not in a position to perceive on the night in question.  We uphold the district court's conclusion that there was not a genuine dispute as to whether the door was open, the suite was dark, and the warnings had been given.

## B.  Reasonableness of the Force Used

Because there are no genuine issues of material fact and "the relevant set of facts" has been determined, the reasonableness of the use of force is "a pure question of law." *Scott*, 550 U.S. at 381 n.8.[5]

Although Lowry has not sued the individual police officers, her *Monell* claim against the City first requires her to establish that the force used against her was unconstitutionally excessive.  In assessing the objective reasonableness of a particular use of force, we consider: (1) "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted," (2) "the government's interest in the use of force," and (3) the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (internal quotation marks and citations omitted).

---

[5] The dissent discusses the question posed by this case in terms of what a jury might decide, but once the facts have been established, this case presents a question of law to be decided by the court.

This inquiry must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. An officer's use of force cannot be deemed excessive based on facts that he reasonably would not have known or anticipated.

1.  The Type and Amount of Force

The first step of the excessive force inquiry requires us to "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa v. City & County of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). We must undertake a case-by-case analysis. *See Torres*, 648 F.3d at 1124 (holding that an excessive force inquiry is a "highly fact-intensive task for which there are no per se rules").

Our precedent establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances. In *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005) (en banc), we held that the use of a police dog constituted excessive force where the officers sicced the dog on the plaintiff three times, including once after he had already been pinned down, and then pepper sprayed his open wounds. Similarly, in *Chew*, we concluded that "the force used to arrest [the plaintiff] was severe" because the dog bit the plaintiff three times, dragged him between four and ten feet, and "nearly severed" his arm. 27 F.3d at 1441. On the other hand, in *Miller v. Clark County*, we held that the use of force, although considerable and serious, was nonetheless reasonable and did not rise to the level of "deadly force," even though the dog apprehended a fleeing suspect with a bite that lasted between forty-five and

sixty seconds, "shredded" the plaintiff's muscles, and reached the bone.  340 F.3d at 961–66.

Here, the district court properly concluded that the use of force was "moderate."  Unlike in *Chew*, 27 F.3d at 1441, where the police dog was "beyond the reach of a countermanding order" when the dog found the plaintiff, dragged him up to ten feet, and "nearly severed" his arm, in this case, Sergeant Nulton closely followed Bak and called her off very quickly after the initial contact with Lowry.  In part because of Nulton's close proximity to Bak, the encounter between Lowry and Bak was so brief that Nulton did not even know if contact had occurred.  Thus, the risk of harm posed by this particular use of force, and the actual harm caused, was moderate.  The district court properly determined that the use of force in this instance was not severe.

## 2.  The City's Interest in the Use of Force

The second step of the excessive force analysis under the Fourth Amendment is to "evaluate the government's interest in the use of force."  *Glenn*, 673 F.3d at 871.  That interest is assessed by considering three primary factors: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Miller*, 340 F.3d at 964. These factors, set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989), are not exclusive, however, and we examine the totality of the circumstances, considering other factors when appropriate.  *Glenn*, 673 F.3d at 872.

The first *Graham* factor, the severity of the crime at issue, weighs in the City's favor. Because the building's burglar alarm had been triggered late at night, the door to the office suite had been left ajar,[6] and no one responded to Sergeant Nulton's warnings, the officers reasonably concluded that a burglary might be in progress.[7] "[B]urglary and attempted burglary are considered to carry an inherent risk of violence." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014). The Supreme Court has stated that "[b]urglary is dangerous because it can end in confrontation leading to violence." *Sykes v. United States*, 564 U.S. 1, 9 (2011), *overruled on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015). Thus, the seriousness of the suspected crime weighs in favor of the City.

The second *Graham* factor, "whether the suspect pose[d] an immediate threat to the safety of the officers or others," is

---

[6] The dissent may exaggerate the significance of the door being propped open. Even if it had been closed, it could be argued that it might not have been unreasonable for officers responding to a burglar alarm at a dark commercial building late at night to check doorknobs to see whether they were locked. The door in question was obviously unlocked, if it was not open, because the officers entered the office on their own. Because the admitted evidence supported the finding that the door was open, though, we need not decide whether that finding or any other factual finding made in this case by the district court was essential to the summary judgment in this case. Each set of circumstances must be evaluated on a case-by-case basis.

[7] The dissent argues that a reasonable officer would have considered the possibility that the burglar alarm was a false alarm, and therefore would not have concluded that a burglary was in progress. Although the burglar alarm was the reason the police arrived on the scene, once the officers approached the building, they made other observations, such as the open door, suggesting a burglary was in progress.

"the most important single element of the three specified factors." *Chew*, 27 F.3d at 1441. When viewing the facts from the perspective of the officers, it is apparent that a reasonable officer could have concluded that if there was someone committing a burglary in the building, that person might be armed and could pose an immediate threat to the safety of the officers. The officers knew that they had been dispatched to respond to a burglar alarm, that they arrived quickly to find a dark commercial building and an open door, and that no one responded to their warnings. In *Miller*, we concluded that the officer was entitled to assume that the suspect posed an immediate threat because he was hiding, the officer did not know whether he was armed, and he had ignored the officer's warning that a police dog would be released. 340 F.3d at 965. Similarly "objectively menacing circumstances" existed here. *See id.*

Moreover, when confronted with signs of a burglary, investigating officers are entitled to protect their own safety. *See Sandoval*, 756 F.3d at 1163. We have previously observed that "when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006). Thus, "[s]o long as the officers have established probable cause for a burglary, 'in such exigent circumstances, the police are entitled to enter immediately using all appropriate force.'" *Sandoval*, 756 F.3d at 1163 (quoting *Frunz*, 468 F.3d at 1145; alterations incorporated). This factor weighs in favor of the City in this case.

The third factor, whether Lowry was resisting or attempting to evade arrest, does not weigh substantially either way here. That factor can be important when an officer is

facing a suspect and can observe whether that suspect is complying or resisting. In this case, though, nobody responded to the warnings shouted by Sergeant Nulton, so the officers did not know anything specific about whomever might have been inside the building. The district court concluded that because Lowry did not respond to Nulton's commands, "the officers could [have] reasonably believe[d] that the suspect was ignoring their commands, thereby evading arrest." Although we have acknowledged that "[e]ven purely passive resistance can support the use of some force," we have explained that "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Our cases suggest that where the suspect passively resists arrest, a lesser degree of force is justified compared to situations in which the suspect actively resists arrest. *See. e.g.*, *Glenn*, 673 F.3d at 875; *Smith*, 394 F.3d at 703. In the end, this factor does not weigh either way in this case.

In assessing the City's interest in the use of force, other relevant factors we have identified include "whether proper warnings were given" and "the availability of less intrusive alternatives to the force employed." *Glenn*, 673 F.3d at 872.

We have held that an important consideration in evaluating the City's interest in the use of force is "whether officers gave a warning before employing the force." *Id.* at 876; *see also Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012). All three officers testified that Sergeant Nulton issued a warning and repeated it before entering the suite with Bak. Although Lowry did not hear the warnings, the officers did not know and had no reason to know that someone would be in a nonresidential building late at night and sleeping so

deeply that she would be unable to hear a warning or to be awakened by the officers' calls. The circumstances were not at all like those in *Nelson*, where we held that the officers had failed to give sufficient warning despite their attempts to do so because they were 45 to 150 feet from the group, in a party of 1,000 people, and it was "undisputed that they lacked any means with which to amplify their voices so that they could be heard over the din of the crowd." 685 F.3d at 882. Here, the officers' issuance of warnings outside the door of the suite weighs in favor of the City.

We also consider "whether there were less intrusive means of force that might have been used before officers resorted" to releasing Bak. *Glenn*, 673 F.3d at 876. In assessing alternatives, however, we must not forget that "officers 'are not required to use the least intrusive degree of force possible.'" *Nelson*, 685 F.3d at 882 (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994)). As *Graham* cautioned, courts must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 397.[8]

---

[8] The dissent relies upon the possibility that the alarm might have been false. Many alarms are false, and likely the officers knew that was a possibility here. The chance the alarm was false did not give the officers reason simply to disregard it, however. They had been dispatched to investigate this alarm. We reasonably expect police officers to respond to alarms, not to ignore them because they might be false.

The real question was whether the officers proceeded unreasonably in their inspection of the building because of the possibility that the alarm was false. The answer to that question was no. If the alarm had gone off by itself and there was nobody in the building, then there would have been

The practice of allowing dogs to inspect areas off-lead is in place to protect officers' safety. Lowry suggests that the police dog could have been kept on her leash, albeit without any evidence in support of the effectiveness of that alternative technique.[9] If that approach had been followed, Sergeant Nulton would have been required to expose himself to what the officers reasonably suspected was a burglar, lurking in the dark office, possibly armed. *See Miller*, 340 F.3d at 968 (concluding that the use of an off-leash police dog was reasonable and rejecting the alternative proposal of keeping the dog on-leash, because it could have led the officer into an ambush or pulled him "into a dangerous situation with no opportunity to react safely"). The conceivable alternatives to SDPD's policy do not weigh against the City's interest in the use of force under these particular circumstances.

### 3. The Balance of Interests

The final step of the excessive force inquiry requires us to balance the gravity of the intrusion on Lowry's Fourth Amendment rights against the City's need for that intrusion.

---

nobody at risk of harm. The only alternative that weighed against releasing Bak was the possibility that there was an innocent person in the building. That turned out to be the case, but that could not have seemed like a likely possibility to the officers at the time. They were at a dark commercial building, late at night, where an alarm had been sounded, and a door was found open. The officers called more than one warning in a loud voice at close range with no response. It was not unreasonable for the officers to infer that the risk of harm to an innocent bystander was small.

[9] In one sentence in her motion opposing summary judgment and on appeal, Lowry presented the "guard and bark" technique as an alternative policy the SDPD should have employed. This was not further developed before the district court.

*Glenn*, 673 F.3d at 871. Here, the force used was not severe, and the officers had a compelling interest in protecting themselves against foreseeable danger in an uncertain situation, which they reasonably suspected to be an ongoing burglary. We conclude that the use of Bak under these circumstances did not violate Lowry's rights under the Fourth Amendment.

## C. *The City's "Bite and Hold" Policy*

Because we conclude that Lowry did not suffer a constitutional injury, she cannot establish liability on the part of the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). As a result, we do not reach the issue of whether the district court properly granted summary judgment on the alternative ground that Lowry failed to satisfy the additional requirements for municipal liability under *Monell*.

## III.  Conclusion

We affirm the summary judgment entered by the district court in favor of the City. There were no genuine disputes of material fact regarding Lowry's claim. From the perspective of a reasonable officer on the scene, the type and amount of force inflicted was moderate, the City had a strong interest in using the force, and the degree of force used was commensurate with the City's interest in the use of that force. The force used was not excessive and did not violate the Fourth Amendment. Because the officers' actions were constitutional, the City cannot be held liable under *Monell.*

**AFFIRMED.**

THOMAS, Chief Judge, dissenting:

Sara Lowry was sleeping in the privacy of her office, when she was attacked and injured by a police dog trained to inflict harm on the first person it encounters. Because a reasonable jury could find that the City of San Diego's use of a police dog was unreasonable under the circumstances presented here, I must respectfully dissent.

I

In my view, the district court erred in concluding that no reasonable jury could find that an excessive force constitutional violation had occurred. Under the *Graham v. Connor* framework, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). As the majority notes, the analysis of the government's interest in the use of force "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9); Majority Op. 11, 13.

While recognizing that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," *id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)), on summary judgment a court

must construe any disputed facts and draw all reasonable inferences in favor of the non-moving party, *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). Here, construing the facts and drawing reasonable inferences in Lowry's favor, a jury could find that the force used was severe, that the government's interest in the use of that force was not especially strong, and, therefore, that the use of a police dog was unreasonable.[1]

## A

At the first step of the *Graham* inquiry, a reasonable jury could find that the intrusion on Lowry's Fourth Amendment interests was moderate or even severe because of the dog bite Lowry suffered, coupled with the *risk* of greater harm she faced from an off-leash police dog trained to bite and hold the first person it found.

Both Supreme Court precedent and our case law require consideration of the risk of harm that may be inflicted by a particular use of force. *Graham* itself requires analyzing both the "nature and quality of the intrusion," 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8), and the Supreme Court has more recently explained that this prong of the analysis

---

[1] The majority emphasizes that the reasonableness of a particular use of force is a "pure question of law" once the facts are established. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); Majority Op. 11 & n.5. However, "[w]here the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury.'" *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003)). Because Lowry has succeeded in raising material disputes of fact, as detailed below, it is the task of the jury to resolve those fact disputes and draw any relevant inferences from them.

requires a court to "consider the risk of bodily harm that [the officer]'s actions posed to [the plaintiff]," *Scott v. Harris*, 550 U.S. 372, 383 (2007). Similarly, we have held that this inquiry requires "evaluating the *type* and amount of force inflicted." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) (emphasis added) (citing *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994)). Thus, the risk of harm posed by a particular use of force — not just the amount of harm actually caused in hindsight — is properly considered as part of the first *Graham* step.

In the current case, Lowry testified that Sergeant Nulton remarked that the dog could have "ripped [Lowry's] face off" and that she was "very lucky" to have gotten only a relatively small bite. In short, there is no dispute that Lowry faced a significant risk of harm when the dog was released into the suite where she was sleeping. Our prior decisions have similarly recognized that "police dogs can — and often do — cause serious harm." *Vera Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1997), *overruled on other grounds by Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005).

In other cases where we have addressed the use of bite-and-hold police dogs, as the majority explains, one plaintiff had suffered a dog bite that "went as deep as the bone" and "shredded" the muscles in his arm, *Miller v. Clark Cty.*, 340 F.3d 959, 961, 964 (9th Cir. 2003), while another sustained multiple bites that "nearly severed" his arm, *Chew*, 27 F.3d at 1441; Majority Op. 12–13. Though the officers in the present case took steps to reduce the risk of harm by following the dog closely and calling him off quickly, these other cases nonetheless illustrate the risk of severe harm that a bite-and-hold police dog may inflict when deployed off-

leash as occurred here.   Therefore, in assessing the reasonableness of the force at the moment when the officers made the decision to use an off-leash police dog — rather than in hindsight, based on Lowry's actual injuries — a reasonable jury could find that the use of force was moderate or severe.

## B

On the other side of the *Graham* scale, a reasonable jury could find that the government did not have a strong interest in using an off-leash bite-and-hold police dog under these circumstances.

## 1

To evaluate the totality of the circumstances as they relate to this step of the *Graham* analysis, we must assess the fact disputes raised by Lowry, particularly the dispute as to whether the door to Lowry's office suite was open (as the officers contend) or closed (as Lowry contends).[2]   Lowry presented admissible evidence that raised a genuine dispute of material fact as to whether the door was open; this fact must therefore be construed in her favor at the summary judgment stage.

In reviewing a district court's evidentiary ruling at the summary judgment stage, as the majority notes, we will

---

[2] As discussed further below, a jury could find that an open door would have given the officers reason to believe a suspect was still in the building, while arriving at a building with no open doors and no signs of forced entry might give the officers less reason to believe that a burglary was actively occurring.

reverse a ruling that is "manifestly erroneous and prejudicial." *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007) (quoting *Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006)); Majority Op. 10. The district court's exclusion of Lowry's testimony about the door was both. Although we generally "refuse[] to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony," *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)), we have also "acknowledged that declarations are often self-serving," *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). We have therefore cautioned that "the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id.* (citing *Phan*, 500 F.3d at 909). Thus, even "uncorroborated and self-serving" testimony may be sufficient to establish a genuine dispute of fact where it is "based on personal knowledge, legally relevant, and internally consistent." *Id.* at 498.

Here, Lowry testified that the door to Suite 201 was shut when the officers arrived because it had automatically closed behind her after she came back in from the bathroom. At her deposition, Lowry gave the following testimony:

> Q. Do you know if the door closed all the way or was it propped open?
>
> A. No. It was not propped. It was closed all the way behind me.
>
> Q. Okay. And how do you know that?

A. Because it closes automatically. I would
have had to prop it open myself.

Q. And do you recall doing that?

A. No.

The district court considered this testimony to be speculation rather than first-hand testimony and determined that the testimony was insufficient to create a dispute of fact. But Lowry's testimony is based on her first-hand knowledge of the door in question and her personal recollection that she did not prop it open on the night in question. Her testimony is also specific, "legally relevant, and internally consistent." *Id.* at 498. "[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Schlup v. Delo*, 513 U.S. 298, 332 (1995) (quoting *Agosto v. INS*, 436 U.S. 748, 756 (1978)). As the Supreme Court has further observed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Thus, it was error for the district court to assess Lowry's credibility and to exclude her testimony.

The exclusion of this testimony, in turn, prejudiced Lowry by denying her an opportunity to show a dispute of fact as to whether the door to the suite was open. Although Lowry's testimony conflicts with the officers' testimony that the door was open when they arrived, at the summary judgment stage the court may not weigh the moving party's evidence against the nonmoving party's evidence. Rather, "the judge must assume the truth of the evidence set forth by the nonmoving

party." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987)). Under this standard, Lowry's testimony raised a genuine dispute of fact as to whether the door was open, and the district court erred in concluding otherwise.

2

Construing this fact and the other circumstances surrounding the incident in the light most favorable to Lowry, and drawing all reasonable inferences in her favor, a reasonable jury could conclude that the government did not have a strong interest in using an off-leash, bite-and-hold-trained police dog here.

First, under "the most important single element" of *Graham*'s government-interest analysis, a reasonable jury could find that the officers on the scene had little reason to believe Lowry "pose[d] an immediate threat to the safety of the officers or others." *Chew*, 27 F.3d at 1441 (quoting *Graham*, 490 U.S. at 396). Assuming that the door to Lowry's office suite was closed, as we must at this stage, the officers arriving on the scene saw that the only way to arrive at the second-floor suites was via a locked gate or by scaling a tall wall, and they saw no open doors nor any signs of forced entry.[3] A jury could find that, from the officers' perspective, these circumstances increased the likelihood that the burglar alarm was a false alarm and "materially

---

[3] While the majority suggests that the door was unlocked even if it was not open, Majority Op. 14 n.6, an unlocked door of the suite next to the one where the alarm was triggered does not lead to the inevitable conclusion that a burglary is likely occurring.

diminished the risk of violent confrontation." *See Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006).

Despite the majority's assertion that officers are entitled to presume a burglary suspect poses an immediate threat, Majority Op. 14–15, our caselaw does not compel that conclusion. Rather, in *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), the officers "knew that Miller had possessed a large knife moments earlier, a fact that suggest[ed] Miller had a propensity to carry a weapon." *Id.* at 965. Here, by contrast, the officers had no specific reason to believe that any person assumed to be inside the office suite was armed.

The City's reliance on *Frunz* to argue that burglars may be presumed armed is similarly misplaced. *Frunz* merely stated in dicta that burglars can sometimes be presumed dangerous, to highlight the contrast with the situation in that case, where the officers knew of certain facts that "made it far less likely that what was going on was a burglary and materially diminished the risk of violent confrontation." 468 F.3d at 1145. Ultimately, therefore, *Frunz* stands only for the proposition that officers must consider all known facts in determining whether a burglary suspect is likely to offer armed resistance.[4] *Id.*

Applying *Frunz*'s admonition to the current case, the circumstances known to the officers gave little indication that

---

[4] Similarly, *Sandoval v. Las Vegas Metropolitan Police Department*, 756 F.3d 1154 (9th Cir. 2014), on which the majority relies, merely repeated *Frunz*'s statement that officers may enter using "all appropriate force" *if* the totality of the circumstances leads them to believe that an active burglary is occurring. *Id.* at 1163 (citing *Frunz*, 468 F.3d at 1145)); Majority Op. 15.

there was an armed suspect inside Suite 201. At the summary judgment stage, critically, the relevant question is not whether the officers could possibly have believed a burglary was occurring but, rather, whether a jury could potentially find that the officers' beliefs were unreasonable under the circumstances. Construing the facts in Lowry's favor, a reasonable jury could find that the officers had little reason to believe that any suspect inside the building "pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Thus, on summary judgment, this factor weighs in favor of Lowry.

The next *Graham* factor asks us to consider "the severity of the crime at issue." 490 U.S. at 396. The parties dispute whether burglary is considered a serious crime, but the answer to that question does not end the inquiry. Even if the officers were entitled to presume that burglary is a serious crime,[5] the real dispute centers on whether a reasonable

---

[5] The majority relies on *Sykes v. United States*, 564 U.S. 1 (2011), *overruled on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sandoval*, 756 F.3d 1154, to support its contention that officers are entitled to presume that burglary is both serious and dangerous. Majority Op. 14–15. In addition to the fact that this approach conflates the first and second *Graham* factors, neither of these cases involved a *Graham* analysis.

In *Sykes*, where the issue presented was an enhanced sentence under the Armed Career Criminal Act, the Court merely noted in passing that burglary "can end in confrontation," by way of comparison to other possibly violent crimes. *Sykes*, 564 U.S. at 9. *Sandoval* concerned the propriety of a warrantless entry, not the reasonableness of a particular use of force. *See* 756 F.3d at 1163. Moreover, as explained above, *Sandoval* merely condoned the use of appropriate force *after* the officers have established exigent circumstances based on the totality of the information available to them. *Id.* at 1163 (citing *Frunz*, 468 F.3d at 1145).

officer on the scene would have concluded that a burglary was in fact taking place, or would have considered the possibility that the burglar alarm was a false alarm, and then acted accordingly.

The fact dispute as to whether the door was open is significant again here: with the door of an office suite ajar at night, the scene looks more like an active burglary; with a closed door and no signs of forced entry, it becomes more likely that the alarm was a false alarm. Construing this fact and drawing all reasonable inferences in Lowry's favor, a jury could find that the officers had reason to doubt an actual burglary was taking place. Because a reasonable officer might not believe a severe crime was taking place, this factor weighs in favor of Lowry at the summary judgment stage.

The final *Graham* factor asks whether the officers reasonably believed that the suspect was "actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The City contends that Lowry's failure to heed Sergeant Nulton's warnings led the officers to believe that the suspect inside the suite was resisting arrest. Yet even if Lowry failed to raise a genuine dispute as to whether the warnings were given, and even if a reasonable officer at the scene would have believed that a person inside the suite heard them, Lowry's simple failure to respond to the warnings does not constitute actively resisting arrest. She was not moving at all.

"Following the Supreme Court's instruction in *Graham*, we have drawn a distinction between passive and active resistance," as the majority acknowledges. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994)); Majority Op. 16. When a suspect's only resistance is

failure to comply with a police order, and when that resistance is "not particularly bellicose," it is considered passive and does not weigh heavily in the government's favor. *Id.*; *see also City of Hemet*, 394 F.3d at 703. Under this precedent, a reasonable jury could find that Lowry's mere failure to respond to the warnings did not constitute active resistance. Thus, on summary judgment, this factor weighs in favor of Lowry.

To the extent that "the giving of a warning or the failure to do so" is sometimes also considered as an independent factor in the *Graham* balancing test, *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001)), I do not disagree with the majority's conclusion that this factor weighs in favor of the City because the officers had no reason to know that the person inside the building was sleeping and did not hear their warnings. *Cf. Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005) (holding that the presence of warnings weighed in favor of the officers where they had no reason to know the suspect was wearing headphones and did not hear the warnings); *see* Majority Op. 16–17.

Finally, our precedent also allows a court to consider whether less intrusive tactics were available to the officers effecting a seizure. *See Bryan*, 630 F.3d at 831; *City of Hemet*, 394 F.3d at 703. Here, Lowry argues that instead of using off-leash dogs trained to bite and hold the first person they come across, the City could and should train its dogs to "find and bark," an alternative approach in which the dog is trained to bark upon locating a suspect and only bite if the suspect tries to flee. Lowry also suggests that the dog should have been kept on-leash to minimize the risk of harm to any

bystanders. The parties dispute the benefits of the "find and bark" method as well as the relative risks and benefits of keeping dogs on-leash during searches like the one in this case. The record is not well developed on this issue; thus the existence of these alternative methods does not weigh heavily in the excessive force analysis here. However, Lowry has sufficiently raised the issue such that this theory would remain available if we were to remand for further proceedings.

C

Balancing the severity of the intrusion against the government's interest, at the third step of the *Graham* analysis, a reasonable jury could conclude that the City's interest in the use of force did not justify the level of force used here. Construing the facts in the light most favorable to Lowry, a jury could find that the intrusion on Lowry's Fourth Amendment interests was moderate or severe. On the other side of the scale, the *Graham* government-interest factors — whether Lowry posed a threat, the severity of the crime, and whether Lowry was resisting arrest — all weigh in favor of Lowry if the facts are construed in her favor, as they must be at this stage. The only factor weighing in favor of the City is the presence of verbal warnings before the dog was released into Lowry's suite.

Thus, balancing the intrusion caused by an off-leash, bite-and-hold-trained police dog against the government's interest in the use of canine force under these circumstances, a reasonable jury could find that "a strong government interest" did not "*compel*[] the employment of such force." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (quoting *Deorle*, 272 F.3d at 1280

(emphasis in original)). I would therefore hold that the district court erred in concluding, as a matter of law, that the use of a police dog did not constitute excessive force.

II

I respectfully suggest that the district court also erred in concluding that the City could not be liable even if excessive force had been established. A municipality may be liable under 42 U.S.C. § 1983 for constitutional violations inflicted by its employees "when the execution of the government's policy or custom . . . inflicts the injury." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (alteration in original) (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting)); *see also Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). "[I]n this circuit a policy itself need only *cause* a constitutional violation; it need not be unconstitutional per se." *Jackson v. Gates*, 975 F.2d 648, 654 (9th Cir. 1992) (emphasis added) (citing *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983)). We have explained that "[c]ity policy 'causes' an injury where it is 'the moving force' behind the constitutional violation." *Chew*, 27 F.3d at 1444 (quoting *Monell*, 436 U.S. at 694).

In this case, Lowry alleged in her complaint that the City had an official policy that caused her constitutional violation. Before the district court and on appeal, Lowry has specifically argued that the City's policy of training its dogs to bite and hold a suspect was the direct cause of her injury. The bite-and-hold policy is properly considered the "moving force" behind Lowry's injury because the dog lunged at her and immediately bit her, according to his bite-and-hold training. *See Chew*, 27 F.3d at 1444. Moreover, the City

admitted in its answer that "Sergeant Nulton deployed a police services dog in conformity with the official policies and procedures adopted by the San Diego Police Department." Accordingly, "[t]here is little doubt that a trier of fact could find that [Lowry]'s injury was caused by city policy." *See Chew*, 27 F.3d at 1444.

The district court erroneously relied on precedent from the qualified immunity context to conclude that the City's bite-and-hold policy was constitutional as a matter of law, and thus that the City could not be liable even if Lowry's constitutional rights had been violated in this particular instance. But our cases analyzing whether the constitutionality of a bite-and-hold policy was *clearly established* for purposes of qualified immunity did not hold that all applications of a bite-and-hold policy are constitutional. Indeed, we have recognized that the *manner* in which bite-and-hold force is employed could be unconstitutional in a particular case. *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (citing *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). In such a case, a municipality could be liable if its bite-and-hold policy is the "moving force" behind an officer's unconstitutional action, even if the policy is not facially unconstitutional. Here, given the City's concession that Sergeant Nulton acted pursuant to its official policy, a jury could find that the policy caused Lowry's constitutional injury and thus that the City is subject to *Monell* liability.

Finally, contrary to the majority's suggestion, a *Monell* plaintiff need not show that the government acted with deliberate indifference to her constitutional rights if she can show that the government's officers acted affirmatively, pursuant to an official policy. Our cases requiring a showing

of deliberate indifference have dealt with a government's *failure* to take action or failure to properly train its employees. *See Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (describing the requirements necessary for "impos[ing] liability on a local governmental entity for *failing to act* to preserve constitutional rights" (emphasis added) (quoting *City of Canton*, 489 U.S. at 389)); *see also Gant v. Cty. of L.A.*, 772 F.3d 608, 618 (9th Cir. 2014) (requiring a plaintiff to show that the government's "omission amounts to deliberate indifference"); *Mortimer v. Baca*, 594 F.3d 714, 716 (9th Cir. 2010) (imposing liability when a local government "has a policy of inaction and such inaction amounts to a failure to protect constitutional rights" (quoting *Oviatt*, 954 F.2d at 1474)); *Chew*, 27 F.3d at 1445 (distinguishing between the different theories of *Monell* liability for officially sanctioned affirmative acts and for failure to train).

Because she did not allege a failure to act and instead alleged that the City's affirmative bite-and-hold policy was the cause of her constitutional injury, Lowry need not demonstrate deliberate indifference. Instead, the City's admission that Sergeant Nulton acted pursuant to official policy adequately demonstrates that the City's policy was the "moving force" behind Lowry's constitutional violation, thereby satisfying this step of the *Monell* analysis on summary judgment. Accordingly, I would hold that the district court erred in granting summary judgment on this alternate ground.

III

By allowing government entities to be held liable when they violate citizens' constitutional rights, § 1983 helps effect

the guarantees of the Fourth Amendment. When, as here, a citizen has succeeded in raising disputes of fact as to whether her Fourth Amendment rights were violated, it is for a jury to decide whether a violation occurred and whether the government is liable for that violation.

For these reasons, I respectfully dissent.